Calvernell **BROWN** et al., Plaintiffs,

v.

**H. T. GREER** et al., Defendants.

Civ. A. No. 1250.

United States District Court

S. D. Mississippi, W. D.

Feb. 26, 1969.

Fred L. Banks, Jr., Reuben V. Anderson, Jackson, Miss., for plaintiffs.

Herman C. Glazier, Jr., Rolling Fork, Miss., for defendants.

## OPINION OF THE COURT

NIXON, District Judge.

Plaintiffs, five minor Negro children, through their adult next friends brought a civil rights action under 42 U.S.C. sec. 1983 on behalf of themselves and all others similarly situated seeking a temporary restraining order and a preliminary and permanent injunction pursuant to 28 U.S.C. sec. 1343 against officials of the Anguilla Line Consolidated School District, in Sharkey County, Mississippi. It was alleged that the plaintiffs' rights under the Eighth Amendment and the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution were breached by school officials in that they were expelled and subsequently suspended for the balance of the 1968–69 school year from the Anguilla Line Consolidated School District. Although Harvie Granger was the sixth plaintiff for whom this suit was filed, it is agreed

between the parties, and the Court so finds, that he was not involved in the hereinafter mentioned incidents, was not expelled or suspended from school by the defendants, and no disciplinary action was taken against him whatsoever as a result thereof; therefore, this action should be and is dismissed as to Harvie Granger.

On October 29, 1968 the day preceding the incident and actions of the plaintiffs resulting in their ultimate suspension for the school year 1968–1969, after school let out for the day subsequent to 3:00 P.M., there was an altercation involving one of the plaintiffs herein, Sezzie Brown, and a white youth named Jerry Martin whose father was a member of the Board of Trustees of the Anguilla Line School District, and who participated in the hereinafter mentioned Board of Trustees action suspending the plaintiffs herein. Mr. Martin, the Board member, is a defendant to this suit. Miss Brown alleges that Jerry Martin struck her. Mr. Lee Martin, the principal of the Anguilla Line Consolidated School for the last two years testified that he did not witness the incident, but upon receiving the report of trouble, he went out and found that the male teachers on duty outside the school building had separated the two parties involved. At that time Sezzie Brown told Jerry Martin that "she'd get him". Mr. Martin testified that although no one requested that any disciplinary action be taken as a result of this incident, he nevertheless had reported this incident to Mr. Hyram Gerrard, the school superintendent; furthermore, he planned to call the two parties involved into his office after school started the following morning and allow them to tell their respective sides of how the incident occurred, and he then would talk to the other witnesses to this incident or altercation; however, he did not have the opportunity to do this because of the hereinafter discussed incidents and occurrences which took place in the school building the following morning. He further testified that he had no opportu-

nity to fully investigate this matter, and that no disciplinary action was taken against Jerry Martin as of the date of this trial nor was he ever called in and asked about what occurred, because Mr. Martin knew that he would give only his side of the story and not Sezzie Brown's side.

On the following morning, Wednesday, October 30, 1968 at approximately 7:30 A.M., before school began, when the librarian opened the door to Superintendent Gerrard's office, Gerrard heard loud, angry voices and went out to investigate. He found Mrs. Sezzie Buckley, who was referred to by the plaintiffs as "Big Mama", and who sued herein as next friend and Grandmother of Calvernell Brown, Elvina Berry and Sezzie Brown plaintiffs, with her son, Edell Buckley, talking to Principal Lee Martin in loud and angry tones. The superintendent persuaded them to come into his office, but they began to verbally abuse him and talk so loud and angrily that he persuaded them to leave and return when Mrs. Buckley could discuss her problem with him.

While riding the school bus to school on that same morning, October 30, 1968, the four female plaintiffs sat on the first two seats directly behind the bus driver, Mr. Jerry Lindsey, who asked them to move because no one was permitted to sit thereon because of safety reasons. They begrudgingly moved, and although Sezzie Brown testified on direct examination that she had seen white children sitting in these seats before, on cross-examination she admitted that the driver never allowed anyone to sit in these seats at any time, and that she had sat in one of these seats on a previous occasion but Mr. Lindsey, the bus driver, had made her move for the same safety reasons, that is, for her protection.

The school bus on which plaintiffs were passengers arrived at the school at approximately 7:50 A.M., and the four female plaintiffs walked to the rest room and then back to the locker area in

the hall. With the exception of one other student, who had no part in the ensuing fracas, and the superintendent, principal and two other teachers, all others had gone to their classrooms. The four female plaintiffs were standing at Elvina Berry's (also known as Elvina Buckley) locker, and Principal Martin saw that Elvina had her locker open, that she would just pick up a book and put it down and would look down the hall every few minutes. She repeated this procedure for approximately five minutes at which time Mr. Gerrard, the school superintendent walked up at approximately 8:03 or 8:04 just before the 8:05 bell rang to start classes and asked the four girls if they had a problem, to which there was no response. He then repeated his question and again received no response. He then addressed Elvina Berry (or Buckley) and told her that he was talking to her, at which time he put or pushed his finger against her back and told her to go to the office. She responded, "I ain't going nowhere.", at which time Gerrard put one hand on her neck and the other on her arm and started marching her to his office. The other three girls began yelling at the superintendent and telling him to get his hands off Miss Berry, that she hadn't done anything, that she was not a dog. They charged toward the superintendent in a frenzy and rage and apparently would have attacked him except for the fact that the principal, Mr. Martin and a teacher, Jerry Lindsey, interceded, at which time Sezzie Brown admitted she struck Mr. Lindsey with her comb and brush after he allegedly grabbed at her. Mr. Martin, the school principal, was struck on his left jaw by one of the plaintiffs with an unidentified object with such force that he "saw stars," and Mr. Lindsey was repeatedly punched in the stomach by Sezzie Brown. Mr. Gerrard, the superintendent, testified also that those not present in their classroom when the 8:00 bell rang were marked tardy and that these four female plaintiffs were tardy at the time this incident occurred although classes did not begin until the 8:05 bell rang.

The four female plaintiffs were finally taken to the superintendent's office but refused to sit down. Sezzie Brown told Mr. Gerrard: "Wait until Big Mama comes and she'll beat your white ass." Mr. Gerrard told her that Big Mama had already been there earlier that morning, at which time Elvina Berry (or Buckley) called him a liar. All the time that the four female plaintiffs were in the superintendent's office they used loud, vulgar and threatening language toward him. The male plaintiff, Wilbert Granger, was sent into the superintendent's office by another teacher because when Wilbert heard the commotion he went out into the hall and refused to come back into the classroom although class was in progress. Mr. Gerrard took him into a room separate from the female plaintiffs, and he then refused to answer the superintendent who inquired as to why he had been sent into the office, finally saying, "Huh." He then told Mr. Gerrard that when Big Mama got there she was going to "whip his white ass", at which time Mr. Gerrard slapped him with his open hand. Upon hearing Wilbert get slapped, the four female plaintiffs rushed into the office where Gerrard and Wilbert Granger were standing verbally abusing the superintendent. Hilda Granger told Mr. Gerrard that "she'd see him dead." All of the plaintiffs used loud, abusive and vulgar language toward Mr. Gerrard and according to the superintendent, "raked him over." Gerrard told the five plaintiffs that they would have to leave school and offered to furnish them transportation, which they refused, leaving the building threatening "to get" the teachers, Mr. Nicholson and Mr. Sumrall, and also threatening "to get" Mr. Lindsey, the bus driver, if he drove the bus that afternoon. They also threatened to burn the (vulgar word) school building down. Approximately ten or fifteen minutes later, the five plaintiffs returned with Mrs. Sezzie

Buckley, also known as "Big Mama" and her son, Edell Buckley. Mrs. Buckley asked Mr. Gerrard why he had sent the plaintiffs home, and after he asked his secretary to leave, he told her the language that the five had used toward him and what had occurred. All of the plaintiffs called him a liar and many other names, and all, including Mrs. Buckley, began verbally abusing the superintendent in loud, abusive and angry voices to such an extent that he became afraid and asked his secretary to call the Sheriff, which she did, but all of the subjects left before the Sheriff arrived. However, in the meantime, Mr. Edell Buckley told Mr. Gerrard that he would see his attorney, in response to which the superintendent invited him to bring his attorney for a discussion of the matter. As the minor plaintiffs left, they repeated their threats using foul and abusive language, threatening to "get Mr. Lindsey", the school bus driver. They also hollered that they would get Mr. Gerrard's "white ass."

During the approximate thirty minutes in which the entire above episode took place, classes were completely disrupted.

On the following day, Thursday, October 31, 1968, James Nicholson, a faculty member, rode the school bus with Mr. Jerry Lindsey, the driver, who also was a faculty member and regularly drove the bus on which the plaintiffs rode. Mr. Lindsey has been afraid to drive and has not driven the school bus subsequently.

On Wednesday, October 30, 1968 Lee Martin, the school principal, posted a letter to Mrs. Sezzie Buckley advising her that her grandchildren, Calvernell Brown, Elvina Berry and Sezzie Brown, were suspended indefinitely because of insubordination and the use of vulgar and abusive language. She was advised by Mr. Martin of the right to a hearing before the Board of Trustees. Likewise, Martin posted a letter to Mrs. Lillie Granger advising her that her children, Hilda Granger and Wilbert Granger, were suspended indefinitely because of insubordination and the use of vulgar and abusive language. She was likewise advised of the right to a hearing before the Board of Trustees.

The plaintiffs charge in their Complaint among other alleged violations of their Constitutional rights, that they were denied the rights guaranteed by the Due Process clause of the Fourteenth Amendment to the United States Constitution in that (a) they were not advised of the nature of the complaints lodged against them prior to their expulsion; (b) they were not advised of the persons who lodged such complaints prior to their expulsion; (c) they were not given an opportunity to defend against such complaints, prior to their expulsion, at a formal hearing, with the right to counsel, and the right of cross-examination afforded; (d) defendants prepared no record of the findings or conclusions which resulted in expulsion, foreclosing review and rebuttal by plaintiffs; and (e) defendants have not adopted and promulgated regulations and policies which establish procedures and criteria for the expulsion of students attending schools in the Anguilla Line Consolidated School District. In order to resolve the alleged denial of due process, it is necessary to consider, in sequence, all of the events that occurred in connection with the plaintiffs' initial expulsion, and later suspension for the 1968–1969 school year. On November 1, 1968, counsel for the suspended students mailed a letter to Mr. Gerrard, superintendent, requesting a hearing on the matter. On November 4, 1968, the Board of Trustees met at its regular monthly meeting date on the first Monday of each month, at which time the matter was presented to the Board by Mr. Gerrard who recommended expulsion of the students, and his recommendation was adopted by the Board without first according plaintiffs due process. On November 5, 1968, Superintendent Gerrard sent a letter to Mr. Fred Banks, attorney for the students advis-

ing him that the Board of Trustees had set Friday, November 8, 1968 at 4:00 P.M. as the time for a meeting which had been requested by counsel. In response to this letter Mr. Banks wrote Mr. Gerrard advising him that in light of the Board's action on November 4, a meeting would be unavailing. On November 8, 1968 Mr. Gerrard posted a letter to plaintiffs' counsel, Mr. Banks, that if he later decided on a hearing it would be arranged.

On November 20, 1968, a mandatory preliminary injunction was sought by plaintiffs to compel school officials to re-admit the suspended students in this suit that was filed. The motion for a preliminary injunction was noticed for hearing on December 28, 1968 before Honorable William Harold Cox, Chief Judge, United States District Court for the Southern District of Mississippi, who ordered that a hearing of this matter be held before the Board of Trustees of the Anguilla Line Consolidated School District at the Superintendent's office at Anguilla, Mississippi, at 9:00 A.M. on Monday, December 30, 1968 with plaintiffs and their representatives and counsel.

The Board of Trustees met at the appointed time with plaintiffs, Sezzie Brown, Hilda Granger and Elvina Berry or Buckley, and Mrs. Sezzie Buckley and their counsel, Mr. Fred Banks and all were permitted to state their case. Although it is contended by plaintiffs in their pleadings that plaintiffs and their counsel were not afforded the right of cross-examination of any witnesses against them, plaintiff Sezzie Brown testified on direct examination that she and the other plaintiffs were allowed to ask Superintendent Gerrard or anyone else any questions at this hearing but that they did not do so. At this hearing the students personally and through counsel admitted that they were at fault concerning the incidents of October 30, 1968 but stated that their acts were provoked by a white student, Jerry Martin, striking one of the girls the day preceding these events, by a white teacher who was driving the school bus and who would not let them sit in the seats immediately behind the driver, and also by Superintendent Gerrard who put his hands on Elvina Berry or Buckley and forced her to go to his office, and who slapped Wilbert Granger for failing to respond to his questions. The Board found that these five students used abusive and threatening language toward the Superintendent and others, struck two faculty members and disrupted the orderly operation of the school with their commotion and by their loud tones of voice and vulgarity. The Board found that these plaintiffs displayed discourteous behavior toward school authorities, disregarded the orderly progression of classroom instruction and exhibited complete disregard for the rights of their fellow students, which, if permitted to go without appropriate punishment, could bring about a complete breakdown in school discipline. The Board rescinded its previous order of expulsion and instead suspended the five minor plaintiffs in question for the balance of the 1968–1969 school year. No written notice of the Board action was sent to the plaintiffs or their attorney but their attorney was informed of the Board action by the school Board's attorney who represents the defendants in this case, Mr. Herman Glazier. A certified copy of the Minutes of the December 30, 1968 Board Meeting, which is a public record, was admitted in evidence herein as Exhibit D–10.

In Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir., 1961), the United States Court of Appeals for the Fifth Circuit dealt definitively with the question of due process in relation to disciplinary proceedings in tax-supported educational institutions. The Court laid down the standards by which disciplinary proceedings should be governed as follows:

"The minimum procedural requirements necessary to satisfy due process

depend upon the circumstances and the interests of the parties involved.

\* \* \*

We are confident that precedent as well as a most fundamental constitutional principle support our holding that due process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct."

The same Court recently had occasion to examine this area again in the case of Wright v. Texas Southern University, 392 F.2d 728 (5th Cir., 1968). The Court speaking through its author, Circuit Judge J. P. Coleman, affirmed the District Court's expulsion of students for misconduct. The Court found that the Dean who disciplined the students personally observed the transgressions in question, just as Superintendent Gerrard observed the activities of the plaintiffs in the instant case and was in fact the principal subject and target of their physical and verbal abuses. The Court further held that the findings of the disciplinary body should be presented in a report available for his and (the student's) inspection if the hearing is not before the Board directly. In the case at bar, however, the Board conducted the December 30, 1968 hearing leading to the plaintiffs' suspension for the balance of the school year, as is observed above, and plaintiffs and their attorney and next of kin were invited to be present at this hearing and were allowed to present evidence in their own behalf and to question anyone, including their accusers, whose identity they certainly knew in view of the facts and circumstances. In Wright v. Texas Southern University, *supra*, at page 729, the Court stated that the students involved should be given the opportunity to present their defense orally or in writing but that this does not mean that they are entitled to the formality of a trial, in the usual sense of that term, but simply that they must be given a fair and reasonable opportunity to make their defense to the charges and to re-

ceive such hearing as meets the requirements of justice, both to the school and to themselves. The Court finds that in view of the above stated facts of this case, plaintiffs were accorded every right guaranteed them by the Due Process clause of the Fourteenth Amendment and their claim of the deprivation of this valuable right is without merit.

■ In order to resolve the question of whether or not plaintiffs were denied rights guaranteed them by the United States Constitution, as alleged, and thus whether they are entitled to the relief which they seek, it is incumbent upon the Court to balance and weigh the rights afforded a citizen by the Eighth Amendment to the United States Constitution and the Equal Protection clause of the Fourteenth Amendment to the United States Constitution, with the interest of the state in maintaining an educational system requiring the formulation and enforcement of rules, regulations and sanctions, including those pertaining to the discipline of school children. The United States Court of Appeals for the Fifth Circuit has recently held that in formulating regulations, including those pertaining to the discipline of school children, school officials have a wide latitude of discretion, although the school is of course always bound by the requirement that the rules and regulations must be reasonable, that is, they must measurably contribute to the maintenance of order and decorum within the educational system. Burnside v. Byars, 363 F.2d 744, 748 (5th Cir., 1966). The Court in *Burnside* stated that regulations which are essential in maintaining order and discipline on school property are reasonable. The Court in that case, in reversing the United States District Court for the Southern District of Mississippi on other grounds, further stated the following:

"We wish to make it quite clear that we do not applaud any attempt to undermine the authority of the school. We support all efforts made by the school to fashion reasonable regula-

tions for the conduct of their students and enforcement of the punishment incurred when such regulations are violated. Obedience to duly constituted authority is a valuable tool, and respect for those in authority must be instilled in our young people."

In Blackwell v. Issaquena County Board of Education, 363 F.2d 749, 753 (5th Cir., 1966) the United States Court of Appeals for the Fifth Circuit in affirming the United States District Court for the Southern District of Mississippi which refused to enjoin school officials from enforcing regulations forbidding the wearing of buttons in connection with an unusual degree of commotion, boisterous conduct, collision with rights of others and the undermining of authority, stated the following:

"It is necessary to prohibit students from using buttons or any other means of disrupting school routine in order to maintain discipline, therefore regulations against the distribution, pinning and throwing of buttons as well as regulations prohibiting discourteous remarks to school personnel, the deliberate absence of a student from class without permission and loud conversation in halls and corridors which can be heard in classrooms are necessary if the school is to continue to properly instruct its students.

It is always within the province of school authorities to provide by regulation the prohibition and punishment of acts calculated to undermine the school routine. This is not only proper in our opinion but is necessary."

In this case, it is shown without dispute, and admitted by the two plaintiffs who testified, that they were angry at the time that Mr. Gerrard, the school Superintendent approached them, and that they refused to answer him and showed defiance toward him and other school authorities on this day in question. The Court finds that all of these plaintiffs used vulgar and abusive language toward the school superintendent and principal and other instructors, assaulting, threatening, cursing them and showing contempt toward them, disrupting classes and exhibiting conduct which, to say the least, was reprehensible in nature and outside the protection afforded these plaintiffs by the United States Constitution, and constituted an abuse of their claimed rights thereunder.

The actions of the school officials were not racially motivated, and in fact, the only mention of race made in this entire incident was that made by the plaintiff who stated that "Big Mama was going to whip Mr. Gerrard's *white* ass." The Court finds that these plaintiffs are merely seeking to inject the issue of race in an effort to justify the unusual degree of commotion, boisterous conduct, collision with the rights of others, defiance of authority and lack of order, discipline and decorum of which they were guilty on this day in question. Certainly, if the Court found that they were being discriminated against because of their race, color or creed, or that the actions of the school officials were motivated thereby, it would, without hesitation, reach a contrary conclusion herein.

As the Court stated in *Blackwell*, the proper operation of public school systems is one of the highest and most fundamental responsibilities of the state, and the school authorities in the instant case, as in Blackwell, had a legitimate and substantial interest in the orderly conduct of the school and a duty to protect such substantial interests in the school's operation.

This Court is convinced that Superintendent Gerrard testified truthfully that the race of the minor plaintiffs had nothing whatsoever to do with the actions which he found it necessary to take to maintain discipline and orderliness in the operation of the Anguilla Line School. It is without dispute that the loud, vulgar and threatening language and violent actions of the plaintiffs, acting as a group, and none of whom ever withdrew or separated himself or herself from the group, evidenced

a defiance of authority, disrupted the orderly operation of the school and bordered on anarchy.

■ This Court cannot and will not substitute its judgment for that of the Board of Trustees who acted on reasonable grounds to maintain order and to insure respect by the students for their teachers, principal and superintendent. This Court will not act as a super school board to second guess the Board of Trustees and the superintendent in this case under the facts and circumstances herein. This Court is concerned that if actions of the type involved herein by the plaintiffs are not punished and discouraged, they will not only lead to anarchy but will result in a suppression of the liberty and autonomy that are the lifeblood of a democracy and its educational institutions. If our institutions are not allowed to rule themselves, within reasonable bounds, as here, then others will rule them and will destroy our educational institutions and system which are the touchstone and foundation of any progressive democracy, which owes its very existence to the fact that it is a government of laws and not of men.

■■ In conclusion, the Court finds that there was an abundance of clear, convincing and unequivocal testimony which supports the action of the Board of Trustees in suspending the plaintiffs for the school year 1968–1969. The Court also finds that the plaintiffs are not entitled to the equity relief which they seek because they have not come into equity with clean hands. See Precision Instrument Manufacturing Co. et al. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L. Ed. 1381 (1945). Thus, the Court finds that the plaintiffs are not entitled to the relief requested, and their application for a temporary restraining order, and a preliminary and permanent injunction will be denied.

A judgment accordingly may be presented to the Court at Biloxi, Mississippi.