**Phillip R. SPEAKE, Earnest Gregory, and Milton Forte, Jr., a Minor, by His Father and Next Friend, Milton Forte, Sr., Plaintiffs,**

**v.**

**Rader GRANTHAM, Dean of Men, University of Southern Mississippi, William D. McCain, President of University of Southern Mississippi, University of Southern Mississippi, Board of Trustees of Institutions of Higher Learning, W. V. Oubre, M. M. Roberts, and E. E. Thrash, Defendants.**

Civ. A. No. 2420.

United States District Court,
S. D. Mississippi,
Hattiesburg Division.

Sept. 23, 1970.

R. M. Sullivan, Hattiesburg, Miss., for plaintiffs.

M. M. Roberts, Hattiesburg, Miss., James E. Rankin, Asst. Atty. Gen. of Mississippi, Ed Davis Noble, Special Asst. Atty. Gen., Jackson, Miss., for defendants.

## MEMORANDUM OPINION

NIXON, District Judge.

The three named plaintiffs, Phillip R. Speake, Earnest Gregory and Milton Forte, Jr., a minor, filed their verified Complaint [1] for injunctive relief against the defendant individually and in their official capacities, invoking the jurisdiction of this Court under 28 U.S.C. Sections 1331 and 1343 and under the First, Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. Section 1983. Subsequently, the plaintiff, Richard A. Peters' Motion for Permission to Intervene as a party plaintiff pursuant to Rule 24(b) (2), F.R.Civ. P., was granted by this Court on August 11, 1970.

All four of the plaintiffs were students attending the defendant school, The Uni-

1. The Complaint was verified by only one of the plaintiffs, Phillip R. Speake, but no point has been made concerning the lack of verification by the other plaintiffs.

versity of Southern Mississippi. Speake and Forte are resident citizens of the State of Mississippi and Gregory is a resident citizen of Canada whose presence in the United States is by permission of the United States Government. Peters' residence is not alleged or disclosed. Speake, Gregory and Peters are of the white race and Forte is of the black race.

The following defendants at all times in question served in the following official capacities: Rader Grantham as Dean of Men of the University of Southern Mississippi; William D. McCain as President of the University; W. V. Oubre as Chief of Security on the University campus; M. M. Roberts as President of the Defendant Board of Trustees of Institutions of Higher Learning, hereinafter referred to as Board of Trustees; and E. E. Thrash as Secretary of the Board of Trustees. The defendant, Board of Trustees of Institutions of Higher Learning (hereafter referred to as Board of Trustees), is an agency of the State of Mississippi responsible for the supervision and control of all state colleges, including the defendant University.

Plaintiffs sought a temporary restraining order as well as a preliminary and permanent injunction, reinstating them in good standing with the defendant, University of Southern Mississippi, from which they allege they have been wrongfully suspended. They further contend that they will suffer irreparable injury unless they are immediately readmitted.

In their Complaint,[2] Plaintiffs state that they were until May 18, 1970 students in good standing at the defendant University, a state owned and operated educational institution located in Hattiesburg, Mississippi, and that their suspensions were violative of their rights secured by the due process clause of the Fourteenth Amendment, as interpreted in Dixon v. Alabama State Board of Edu-

cation.[3] It is now well established that precedent, as well as the most fundamental constitutional principles, require an adequate notice of charges and the opportunity of a fair and reasonable hearing on those charges in order to accord with the requirements of procedural due process as a prerequisite to disciplinary action taken against a student attending a tax supported college or institution.

After a full hearing on the Motion for Temporary Restraining Order, this Court found in a written Memorandum Opinion filed herein that plaintiffs were not accorded procedural due process by the proceedings conducted by the Disciplinary Committee of the defendant University inasmuch as they were not given the specific names of witnesses who would testify against them, with the exception of the name of the defendant Grantham; they were not furnished with copies of statements of witnesses who were to testify; they were not accorded the right to hear the witnesses against them testify before the Committee; and they were denied the right to have their attorney present to participate therein. At the time of the TRO hearing before this Court plaintiffs had appealed their suspensions[4] to the defendant, Dr. McCain, President of the University, who had taken no action thereon. Neither had the defendant Board of Trustees of the University met to consider or review the disciplinary action of the Committee.

Therefore, this Court granted plaintiffs' Motion for a Temporary Restraining Order, immediately reinstating them as students in good standing with the University. The Order preserved the right of the University to take further action after the plaintiffs had been given adequate notice of the charges against them and had been afforded a fair and reasonable hearing to be conducted in compliance with the following require-

---

2. The Complaint was filed on June 4, 1970.

3. 294 F.2d 150 (C.A.5, 1961), cert. den. 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961).

4. On May 22, 1970, the Committee indefinitely suspended the four plaintiffs with the right to apply for readmittance one year from the date thereof.

ments and procedures prescribed by this Court:[5]

"(1) The plaintiffs and their attorney shall be given ten days notice in writing by certified mail of the place, date and time of the hearing, this period to commence one day subsequent to the date of mailing of the notice;

(2) Proceedings at the hearing shall be transcribed at the expense of the defendant University and a copy shall be furnished the Court and opposing counsel;

(3) The Board shall decide this matter in writing and in sufficient detail to disclose the basis of its findings and action taken pursuant thereto;

(4) This hearing shall be de novo and both the University and the plaintiffs herein shall have the right to present witnesses or other evidence, whether previously presented before the Disciplinary Committee or not; and plaintiffs shall be informed of the names and addresses of all witnesses to be called by the University and furnish a statement consisting of the substance of the potential witness' testimony at least five (5) days prior to the day of the hearing, as well as copies of any other documentary evidence which will be introduced;

(5) Plaintiffs and their counsel shall have the right of cross examination of any of the witnesses appearing at the hearing and the right to present witnesses or other evidence on their behalf and

may object to the admission of any testimony or evidence;

(6) The Board may not increase the severity of any punishment previously administered to the plaintiffs by the University."

This Court further restrained the defendants from inflicting any disciplinary punishment on the three original plaintiffs for an additional period of seven days after the transcript of the hearing before the Board of Trustees had been filed with the Court, at the expiration of which time the stay would expire unless the plaintiffs applied to the Court for further relief, in which event, the temporary restraining order would remain in effect until the disposition of this case by this Court.

In compliance with the above Order, the University scheduled a hearing for July 2, 1970. The three original plaintiffs herein, who were the only plaintiffs before the Court at that time, were notified in writing, of the charges against them [6] more than ten days in advance of the hearing and also of their right to appear personally and with their counsel to oppose the charges.

The charges against each of the three original plaintiffs herein, which constituted the basis for the de novo hearing, and as set forth in the notice thereof are:

"1. That you and each of you were in possession of false notices that classes would not meet on May 18 and 19, 1970 at the University of Southern Mississippi, and that this was an intent to obstruct or disrupt the academic processes of the University of Southern Mississippi (See No. 1 of Stand-

5. See Marzette v. McPhee, 294 F.Supp. 562, 567 (W.D.Wis., 1968).

6. A copy of this Court's Order entered pursuant to its Memorandum Opinion, granting the Temporary Restraining Order and ordering the hearing in the manner set out above, was attached to the notice as Exhibit "A" thereto. A copy of the typed poster or leaflet which is the

subject of Charge 1 contained in the notice is attached to the notice as Exhibit "B" thereto. This notice together with Exhibits "A" and "B" thereto are found on page 58 in Volume I of the transcript of the hearing before the Board of Trustees filed herein pursuant to this Court's Order as Exhibit "D" to the testimony of Dean Rader Grantham.

ards of Student Conduct in student handbook); and a copy of said flase (sic) notice is attached hereto as Exhibit 'B' and made a part hereof; and

2. That you and each of you disavowed any knowledge of the presence of these notices with you (sic) or that you had knowledge thereof or of the existence thereof; and

3. That you and each of you with others in concert, and that is to say in company with each other and others assembled at the south entrance to the Main Auditorium on the campus of the University of Southern Mississippi before 9:00 o'clock P.M. on the night of Sunday, May 17, 1970, and from there went to the home of Dr. William D. McCain, President of the University of Southern Mississippi, and on the campus thereof and a number of the group made demands and threats and used profanity and vulgar language and which permeated the atmosphere and this meeting had therewith two or all of you and you remained there with others until you and others were satisfied that the President of the University was not at his home; and thereafter you and each of you and others went to the Newman Club on the Northerly side of West Fourth Street and opposite the Coliseum on the campus of the University of Southern Mississippi, and from that point you and each of you and others acting in concert with others prepared for use leaflets as per Exhibit 'B' hereto; and thereafter with the use of a motor vehicle of Phillip R. Speake, aforesaid, these leaflets were distributed or passed out or moved through the campus area and that each of you were in said automobile which was a Volkswagen bus being driven or operated by Phillip R. Speake wherein you and each of you were riding, and in which there were these leaflets; but you and each of you at Scott Hall on the University campus denied knowledge of the presence of these leaflets in said motor vehicle, and subsequently Milton Forte, Jr. left the motor vehicle at the rear of Scott Hall on said University campus and Phillip R. Speake and Earnest Gregory remained therein with two others and drove away and ran a stop sign in violation of campus rules and regulations but were subsequently apprehended at said Newman Club and the leaflets in large quantities were remaining in said motor vehicle and which leaflets are as that of Exhibit 'B' hereto; and you and each of you were a part and parcel of a conspiracy to cause disruption of the campus of the University of Southern Mississippi and to direct the academic processes into confusion during the last week of the regular 1969–70 season; and in so acting and continuing individually or in concert with others, you were disclosing on your respects parts poor citizenship standards for the community in which you residing, living and moving on the occasion herein identified. You conduct defied and degraded administrative authority and did violence to those students on the campus who were there for an education." [7]

Subsequently, on July 2, 1970, a full and fair evidentiary hearing before the Board of Trustees was afforded the plaintiffs. At this hearing which was conducted pursuant to the instructions contained in the above Order of this Court, the plaintiffs were ably and adequately represented by counsel and they were

---

7. By agreement of the parties, Charge 3 was withdrawn (Tr. pp. 2–3).

given the widest latitude on direct and cross examination. The three original plaintiffs testified in their own defense, either personally or through deposition, as did other witnesses for and on behalf of the plaintiffs. The plaintiff, Peters, was not present and did not testify.

At the conclusion of the de novo hearing, the Board of Trustees filed herein its written Findings of Fact, Conclusions of Law and Order in which it found, based upon the evidence, that the three original plaintiffs herein were guilty of the two charges brought against them, and therefore suspended them from attending the University of Southern Mississippi as students until May 22, 1971 at which time they will be eligible for readmission on application to and acceptance by the University.

On August 5, 1970, the two volume verbatim transcript of the hearing before the Board of Trustees was filed herein pursuant to the previous Order of this Court, and on August 6, 1970, the new and additional plaintiff, Richard A. Peters, filed herein a Motion for Intervention requesting permission to file his Complaint and join in with the other three plaintiffs alleging that he was also indefinitely suspended from the defendant University at the same time and on the same grounds that the other plaintiffs were suspended and that he asks for the same relief sought by his co-plaintiffs. In his motion, Peters agreed to enter this action in its present status if permission to intervene was given in order not to "delay the prosecution of this cause." This Court by Order of August 11, 1970 granted Peters permission to intervene on the above basis, and he consequently filed his Complaint herein on that same date.

On August 11, 1970, the plaintiffs filed a "Motion for Further Relief" and accordingly, the Temporary Restraining Order or stay granted by this Court was continued in effect until the final disposition of this case by this Court.

### THE FACTS

It is necessary to set forth in considerable detail the conduct of the plaintiffs which constitutes the basis of the charges against them and which resulted in the disciplinary action taken by the Board.

More specifically and concisely stated, the alleged misconduct of the plaintiffs which resulted in the disciplinary action taken against them is: (1) possession of leaflets or pamphlets containing false information that classes would be suspended on Monday, May 18 and Tuesday, May 19, the two last days preceding final examinations to be held on May 20 and 21, because of the violence at Jackson State and the "critical situation on our campus",[8] which notices were designed to obstruct or disrupt the academic processes of the University of Southern Mississippi; and (2) the untruthful denial by plaintiffs of any knowledge of the presence of these notices in the vehicle occupied by them and owned and driven by the plaintiff, Phillip Speake, or "the existence thereof".

In the afternoon of May 17, 1970 a memorial service was held, with the permission of University officials, in the auditorium on the University of Southern Mississippi campus for students killed in the unfortunate and tragic Jackson State shootings. Although some white students participated in this service, it was principally attended by black students. State Representative Julian Bond of Georgia was slated to speak on that same night at the auditorium, but shortly before the speaking was to begin he telegraphed that he would be unable to fulfill this engagement. Consequently, University officials arranged for someone to be present on the auditorium steps to so inform those who came to hear Mr. Bond speak. Apparently students who were so informed in front of the auditorium be-

8. Although there were three differently worded pamphlets involved (Exhibits A, B and C to the Board's Transcript, pp. 42, 53, 54) they all in essence contain the same false announcement or language.

gan to gather in a group, and after they were addressed by one or more persons, a substantial number of them estimated by one witness to be 30 to 50, and by another to be 80 to 100, walked together across the campus to the home of the defendant, William D. McCain, President of the University, where they demanded to speak to him. However, he was out of town. The plaintiffs, Earnest Gregory and Milton Forte, Jr., were members of this group of students who were talking in loud voices and yelling that they wanted to see President McCain to "let him know how we feel." The majority of these students were black. After being persuaded to move away from the corner of the President's home onto a stretch of lawn at the turn of his driveway, most of them sat down and listened to several spokesmen who addressed them. One of these students named Burkett asked the defendant, Charles W. Moorman, Dean of the University and Chief academic officer, who was in charge of the University in the absence of President McCain, if classes were going to be dismissed, to which the Dean replied, "No, absolutely not." In response to the further inquiry as to why they would not be dismissed, he answered: "because this is an educational institution * * *". At that point the Dean's voice was thoroughly drowned out by the crowd which "hooted him down." [9] After the passage of approximately an hour, the group of students was persuaded to disperse pursuant to a promise by Dean Moorman that he and certain other University officials would thereafter immediately meet with a selected number of their spokesmen. This meeting did take place at approximately 10:00 P.M. and was attended by Dean Moorman, the defendant Rader Grantham, Dean of Men, Dean Durkee and Mr. Kirkpatrick, all representing University officials, and three student leaders, none of whom were the plaintiffs herein and an "outsider" named Buford Posey. Dr. McCain, the President of the University was contacted by telephone by Dean Moorman and he agreed to meet with a few student spokesmen the next morning in his office.

It was established without dispute that President McCain had always made it a point of having an open door policy for all students and faculty alike, and that the officials at the defendant University had always been most cooperative with the student body, had listened to their complaints and suggestions on many occasions and had afforded students the greatest educational freedom and opportunity to express themselves as could be shown by any University officials while still discharging their duties and responsibilities to educate in an orderly and lawful manner under conditions not only conducive to, but necessary in accomplishing their goal of providing the students a quality education on a livable, democratic campus. This is exemplified by the fact that despite the tense situation that existed in the area of President McCain's home because of the above gathering and demonstration, University officials rejected an offer of assistance from the Hattiesburg Police Department by informing members thereof who came onto the campus in a city patrol car, that they were not needed or wanted and which resulted in their leaving immediately.[10]

At approximately 2:00 A.M. on the morning of May 18, Patrolman Miles H. King, a member of the University Security Department who worked the 11:00 P.M. to 7:00 A.M. shift was notified of the existence of, and shown one of the leaflets in question by the desk sergeant on duty at the Security Office of the campus. King notified Lonnie T. Shoultz, Assistant Director of the University Union and part-time employee of the campus Security Department, who in turn called W. V. Oubre, Director or Chief of Security of the University. Oubre relayed the message by telephone to Dean Rader Grantham, Dean of Men, at his home. It was determined that a student, Maurice Neal Hazen, whose dep-

9. Tr. p. 15.

10. See Tr. p. 29.

osition testimony was offered by the plaintiffs herein and admitted as Exhibit "I" at the Board of Trustees hearing, had found the leaflet posted on the lobby door of Scott Hall, a campus dormitory for men. Approximately 185 to 200 of these leaflets were removed from under and on room doors and bulletin boards and other areas of the men's dormitories, namely: 60 to 75 leaflets from Scott Hall, 50 from Bond Hall and 75 from Elam Arms pursuant to Dean Grantham's instructions, in order to prevent them from affecting normal operations of the educational environment at the University, because, in his words, they "definitely would have caused disruption and confusion." [11]

Shortly after 2:00 A.M. on the morning of May 18, 1970, Dean Grantham, Shoultz and King met on the University campus and proceeded to. Scott Hall where they saw a dark green Volkswagen micro-bus with a white top, owned by Speake, parked at the west end of Scott. The plaintiff, Speake, was sitting behind the wheel and seated next to him was the plaintiff, Forte. The plaintiffs, Peters and Gregory, together with several others got out of the micro-bus. Some entered Scott Hall, but Gregory reentered the micro-bus and he, Speake and another student identified as Joe Welford wheeled off after they denied knowing anything about the leaflets in question and Speake had refused to allow Dean Grantham to search his vehicle. Chief Oubre, who had just arrived, stopped them and Speake refused to give him permission to search the micro-bus; therefore, no search was made at that time. As the bus departed the area of Scott Hall, the officials noticed that it failed to stop in obedience to a yellow stop sign painted on the street at an intersection on campus, and it was followed at approximately a speed of 20 miles an hour to its destination at the Newman Center, a Catholic sponsored place of activity just off the campus. When it was stopped and the occupants alighted, Chief Oubre asked to see Speake's drivers license, informed him

that he was under arrest for running a stop sign on the campus, and proceeded to write him a ticket. At this time, Shoultz looked through the window of the microbus and observed a stack of the subject leaflets protruding from under the front seat of the vehicle and informed Chief Oubre of this fact. Pursuant to Oubre's instructions, Shoultz opened the door of the micro-bus with the assistance of Speake and removed a stack of approximately 200 of the pamphlets in question which were identical with the pamphlets found in the men's dormitories. In the meantime, Gregory had run into the Newman Center and telephoned the attorney who now represents the plaintiffs, seeking his legal assistance.

All of the plaintiffs then denied and still deny that they knew of the existence of either the leaflets removed from the micro-bus or those posted in the dormitories on the campus, and all denied that they were responsible for the presence of the leaflets in the micro-bus. Speake's only explanation concerning the presence of this large number of leaflets in the bus owned and occupied by him and the other plaintiffs was that perhaps they were placed therein by Peters or one of the other three or four students whom he had just previously picked up and given a ride to Scott Hall, although none of the plaintiffs recall seeing any leaflets or papers in the hands of any of these students. Speake testified that he, the other three plaintiffs, and two other students, Forte's brother and Joe Welford, had departed from the Newman Center shortly after 2:00 A.M. on May 18 to proceed to an off-campus apartment rented by a student named Bill Johnson and the plaintiff, Richard Peters, and stayed there approximately 15 minutes drinking coffee. Speake and Gregory further testified that they had met earlier on the night of May 17 at approximately 10:00 P.M. at the Newman Center and had driven to the home of a female resident of Hattiesburg where they talked to her approximately four hours concerning a donation or contribution which she wish-

11. See Tr. p. 55.

ed to make to the Newman Center, following her earlier call to Father Lorenzo Diamond, the Catholic Priest in charge of the Newman Center and who in turn had asked Earnest Gregory to call on the lady to discuss the matter.

## GROUNDS FOR RELIEF

In their original Complaint filed herein, plaintiffs, in addition to alleging the denial of procedural due process, which this Court found to be meritorious, but which safeguard has now been afforded them by the Board of Trustees hearing held in conformance with and pursuant to the Order of this Court, further charge that they were subjected to an unlawful arrest and unlawful search and seizure which resulted in the discovery of the 200 leaflets in Speake's micro-bus. They asked that the Court restrain the defendants from introducing any evidence against plaintiffs secured as a result of the alleged unlawful search and seizure, and demand reasonable attorney's fees as well as damages against the defendants in the amount of $500.00 actual damages and $2,000 punitive damages, which they contend resulted therefrom.

Subsequent to the hearing held by the Board of Trustees and the filing herein of its Findings of Fact, Conclusions of Law and Order based on the hearing as well as the transcript thereof, plaintiffs on August 11, 1970, prior to the final hearing conducted by this Court in this matter on August 28, 1970, filed their "Motion for Further Relief" in which they have set forth the following grounds which they contend entitle them to prevail:

(1) A reiteration of the allegation of unreasonable search in violation of the Fourth Amendment to the Constitution of the United States;

(2) That the simple possession of the leaflets in question constitutes no grounds for punishment and is protected by the First Amendment to the United States Constitution;

(3) The disciplinary punishment of plaintiffs constitutes a cruel and unusual form of punishment and violates the Eighth Amendment to the United States Constitution;

(4) Plaintiffs are being punished because of their political and racial beliefs and the actions of the defendants were unreasonable, arbitrary and racially motivated, in violation of the First and Fourteenth Amendments to the United States Constitution;

(5) That plaintiffs were deprived of due process and that this Court's previous order was violated in view of the fact that the written notice of charges served upon them informed them that they were charged with violating only Rule 1 of the Standards of Student Conduct contained in the official school publication, "Drawl" and at the hearing itself plaintiffs discovered to their surprise that they were also being tried for violating Rule 18;

(6) That Rules 1 and 18 violate the Fourteenth Amendment to the Constitution of the United States inasmuch as they constitute an abridgement of the privileges and immunities of citizens of the United States;

(7) That the evidence of record is insufficient to prove or establish the charges against the defendants and to establish good cause for the disciplinary action taken against them.

Before discussing the basic issues of this case, namely, (1) the sufficiency of the evidence to support the disciplinary action and (2) whether the University authorities in the exercise of their power to regulate student conduct in order to accomplish their primary and all-important goal of providing a quality education for students in an atmosphere conducive thereto, have deprived the plaintiffs of constitutionally protected rights, it is not only proper, but necessary, in this Court's opinion, to consider the relationship between a University and its students in this great democracy within the framework of the Constitution of the

United States and its interpretation and application by the Courts of our land.[12]

This Court, as a premise on which to decide the many complex questions raised in this case finds it necessary to consider the traditional and accepted relationship between the University and its students together with the dominant missions, tasks and obligations of tax-supported educational institutions and the corresponding duties, responsibilities and obligations of their students.

In a symposium which is entitled "Student Rights and Campus Rules"[13] these mutual rights, obligations and responsibilities were discussed with clarity and insight:

"Broadly stated, the mission of the University is to impart and to advance the boundaries of knowledge. This carries with it administrative responsibilities to control and regulate whatever conduct and behavior of the members of the university family impedes, obstructs, or threatens the achievement of its educational goals. In turn it is the responsibility of the students and faculty to refrain from conduct that obstructs or interferes with the educational and research objectives of the university which impairs the full development of the mutual process of teaching and learning or which imposes restraints upon the advancement of knowledge. In part, these mutual responsibilities are reflected in rules and regulations ordinarily accepted as a matter of course, but which are now the target of intense reaction that goes almost to the point of rejecting the authority of the university to make any rules at all. To be sure, the point of the attack is almost entirely directed against those rules and regulations which affect political speech and assemblage on campus and which open the door to imposition of academic sanctions for off-campus activity, more particularly of course, for participation in so-called 'civil disobedience'." [14]

Included in the traditional lawful mission of tax-supported higher education in this country are: to provide as full as possible realization of democracy in every phase of living; to teach the practice of excellence in conduct, behavior, and performance; to train students to become citizens who will assist in insuring domestic tranquility; to develop and teach lawful methods of change and improvement in the existing political and social order; to provide students with the young men and women who are approaching or have approached adulthood to safeguard, protect and perpetuate the precious gifts that this great democracy has afforded and which has been wrought in the way of human liberty and political and governmental rights; to respect the law and authority so that they will know that the very touchstone and basis of a democratic government is that it is a government of law and not of man.

Attendance at a tax-supported educational institution of higher learning is not compulsory but is afforded all qualified persons regardless of race, color or creed. Whether this advantage and opportunity is designated a right or a privilege is inconsequential because in the final analysis it is voluntary. Education is vital and valuable,[15] and remaining in college in good standing, much like reputation, is also something of value.[16] So also is one's per-

---

12. For an extensive and exhaustive discussion of this subject see the excellent opinion of U. S. District Judge Ben C. Dawkins, Jr. in Zanders v. Louisiana State Board of Education, 281 F.Supp. 747, 754–758 (W.D.La., 1968)..

13. 54 Cal.L.Rev. 1.

14. Sherry Governance of the University: Rules, Rights, and Responsibilities, 54 Cal.L.Rev. 27 (1966).

15. Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 688, 98 L.Ed. 873 (1954).

16. Dixon v. Alabama State Board of Education, 294 F.2d 157 (C.A.5, 1961), cert. den. 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed. 2d 193 (1961).

sonal freedom, but one may act so as to constitutionally lose that freedom and similarly one may act so as to constitutionally lose his right or privilege to attend a college.[17] The voluntary entrance and attendance of a student in a tax-supported institution is a voluntary entrance into the academic community, and thereby the student voluntarily assumes obligations of performance and behavior reasonably imposed by the institution of choice related to its lawful missions, processes and functions which have been characterized by some as obligations generally much higher than those imposed on all citizens by the civil and criminal law. So long as there is no invidious discrimination, no deprival of due process, no abridgement of a right protected under the circumstances, and no capricious, clearly, unreasonable or unlawful action employed, the institution may discipline students to secure compliance with these higher obligations as a teaching method or to sever the student from the academic community.

No student may, without subjecting himself to reasonable and lawful discipline, intentionally act to impair or prevent the accomplishment of any lawful mission, process or function of an educational institution or to unlawfully interfere with or impede the educational opportunity and rights of his fellow students. A college or university has the inherent power to promulgate rules and regulations; the right to discipline; the right to protect itself and its property through lawful means; the right to expect its students to adhere generally to accepted standards of conduct commensurate with their approaching maturity and majority. Flexibility and elbow room are to be preferred over specificity. When he voluntarily enters an educational institution, a student impliedly agrees to abide by certain standards of conduct expected of him and submits himself to reasonable discipline by the school. He agrees that his conduct and character shall not be detrimental to the school or its educational goals; that his conduct and character will be such that it will not interfere with the relationship between the school and his fellow students or abridge the reasonable educational rights of his fellow students. He also agrees that when he fails in any of the duties devolving upon him, the school authorities may inflict upon him reasonable discipline, which within their discretion, is appropriate and proper under the circumstances.

In addition to the above obligations of the University, it agrees with the student that it will instruct him; aid him in the ordinary ways of his studies; treat him fairly and not discriminate against him; give him every reasonable opportunity to learn and to improve himself morally, mentally and physically and will not impose upon him unjust or unreasonable penalties; and that it will afford him impartial and fair treatment.[18]

The United States District Court for the Western District of Missouri sitting en banc has by general order enunciated a uniform judicial standard of procedure and substance applicable to cases in which questions involving disciplinary action of students in tax-supported institutions of higher learning are presented.[19] That Court, in discussing the relations of courts and education stated the following with which this Court unqualifiedly and heartily agrees:

"Achieving the ideal of justice is the highest goal of humanity. Justice is not the concern solely of the courts. Education is equally concerned with the achievement of ideal justice. The administration of justice by the

---

17. Esteban v. Central Missouri State College, 415 F.2d 1077, 1089 (C.A.8, 1969).

18. Zanders v. Louisiana State Board of Education, supra, 281 F.Supp. at 756; Koblitz v. Western Reserve University, 21 Ohio Cir.Ct.R. 154 (1901).

19. General Order on Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax-Supported Institutions of Higher Education, 45 F.R.D. 133, 135–136 (1968).

courts in the United States represents the people's best efforts to achieve the ideal of justice in the field of civil and criminal law. It is generally accepted that the courts are necessary to this administration of justice and for the protection of individual liberties. Nevertheless, the contributions of the modern courts in achieving the ideals of justice are primarily the products of higher education. The modern courts are, and will continue to be, greatly indebted to higher education for their personnel, their innovations, their processes, their political support, and their future in the political and social order. Higher education is the primary source of study and support of improvement in the courts. For this reason, among others, the courts should exercise caution when importuned to intervene in the important processes and functions of education. A court should never intervene in the processes of education without understanding the nature of education.

* * * * * *

" * * * As such, education deserves the highest respect and the fullest protection of the courts in the performance of its lawful missions." Although this Court agrees with the above broad statement, nevertheless it is aware of the fact that the courts, and particularly Federal courts, have been called upon to invoke, and have invoked, their jurisdiction and have thereby entered, often reluctantly, into the academic arena of student disciplinary matters because of serious and complex considerations of situations which have resulted from the administration of rules and regulations or standards of conduct and their far reaching effects.[20]

## MERITS OF THE CASE

### A. Search and Seizure

Plaintiffs contend both in their Complaint and in their Motion for Further

Relief that they were subjected to an unlawful search and seizure which resulted in the discovery of the 200 leaflets in Speake's micro-bus which constitutes the principal basis of the charges against them. In their Complaint they asked the Court to restrain the defendants from introducing into evidence any of these leaflets that were found in the micro-bus owned by plaintiff Speake, because this evidence was secured as a result of an alleged unlawful search and seizure. In addition, they demand of the defendants reasonable attorney's fees and $500 actual damages and $2,000 punitive damages as a result of the alleged unlawful arrest, search and seizure. At the hearing before the Board of Trustees, plaintiffs' counsel vigorously and repeatedly reiterated this objection, contending that the search and seizure was violative of the plaintiffs' rights secured by the Fourth Amendment to the United States Constitution, and was thus incompetent evidence against them.

 In this Court's opinion this objection was correctly overruled and the evidence properly admitted and considered by the Board. It is established beyond cavil that one does not lose his constitutional rights by metriculation at a college. Those rights follow the student through the classroom door. Tinker v. Des Moines, Ind. School District.[21] In Tinker the United States Supreme Court stated the following with reference to First Amendment rights:

"First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights, freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years." 393 U.S. at 506, 89 S.Ct. at 736. See also Dixon v. Alabama State Board of Education, 294 F.2d 150 (C.A.5, 1961).

---

20. Zanders v. Louisiana State Board of Education, *supra*, 281 F.Supp. at p. 758.

21. 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

On the other hand, the following view has been expressed:

"The nature and procedures of the disciplinary process (disciplinary punishment less than irrevocable expulsion) should not be required to conform to federal processes of criminal law, which are far from perfect, and designed for circumstances and ends unrelated to the academic community. A judicial mandate to impose upon the academic community and student discipline the intricate, time consuming, sophisticated procedures, rules and safeguards of criminal law would frustrate the teaching process and render the institutional control impotent." [22]

In its foregoing en banc order approving, adopting and incorporating the above cited Memorandum, the United States District Court for the Western District of Missouri went on to further state that a Federal Court should not intervene to reverse or enjoin disciplinary actions relevant to a lawful mission of an educational institution unless they appear as one of the following: (1) a deprival of due process, that is, a fundamental concept of fair play; (2) invidious discrimination, for example, on account of race or religion; (3) denial of federal rights, constitutional or statutory, protected in the academic community; or (4) clearly unreasonable, arbitrary or capricious actions.[23]

Although this Court finds some merit in the view that disciplinary punishment short of irrevocable expulsion of students should not be required to con-form inexorably to the rules, safeguards and procedure of criminal law, nevertheless, for purposes of resolving this search and seizure question, this Court will nevertheless consider this question as if it were raised in a criminal prosecution. In this light, if compliance with the requirements of the Constitution and the law is not forthcoming, the inevitable result is that seized items or objects frequently of great probative value must be suppressed and excluded from evidence at the trial. This exclusionary rule is designed to discourage violations by law enforcement officials of Fourth Amendment rights by prohibiting the property or objects seized from being used to assure convictions. The rule applies regardless of whether the prosecution is federal or state and regardless of whether the evidence was obtained by federal or state officers.[24] Unquestionably, when a person is lawfully arrested the police have the right, without a search warrant to make a contemporaneous search of his person and of a motor car in which he is a passenger for evidence of a criminal offense in violation of the law.[25] This Circuit has held that officers who make a valid arrest of the driver of a motor vehicle on a highway for a traffic offense or violation, may, at the time and place of the arrest, lawfully make a search of the vehicle, and the fruits of such search will not be excluded from evidence in a criminal trial for an offense disclosed by the search on the ground that such offense is unrelated to the traffic offense for which the arrest was made, unless the arrest is a pretext for a search.[26] The plain-

---

22. General Order on Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax-Supported Institutions of Higher Education by the United States District Court for the Western District of Missouri, en banc, 45 F.R.D. 133 at 142 (1968).

23. Ibid at p. 143.

24. Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Elkins v. United States, 364 U.S. 206, 80 S.Ct.

1437, 4 L.Ed.2d 1669 (1960); Rea v. United States, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233 (1956); Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

25. Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 11 L.Ed.2d 777; 18 U.S.C. § 3103a, 82 Stat. 238 (1968).

26. Walter George Wellman v. United States, 414 F.2d 263 (C.A.5, 1968), [Slip Opinion No. 25,849, decided Dec. 3, 1968];

tiffs contend that the arrest of Speake, who owned and was driving the microbus in question, under the facts and circumstances of this case was merely a pretext and subterfuge to enable the Director of Security and the Dean to search the bus after they had been refused permission to do so on two occasions. This Court disagrees with plaintiffs' contention in view of the fact that the uncontradicted testimony of Dean Grantham, Chief Oubre, Patrolman King and Lonnie Shoultz was that the microbus was not brought to a stop in obedience to the stop sign which was present at an intersection on the University campus where more collisions had occurred than at any other intersection. Speake himself testified that he did not recall whether he stopped in obedience to the stop sign, and therefore the Court finds as a fact that he did violate the traffic regulation by failing to stop and was lawfully arrested. Thus, the contemporaneous search which was conducted of this vehicle was incidental to this lawful arrest and therefore legal.

 In Preston v. United States, *supra*, the United States Supreme Court stated:

"Common sense dictates, of course, that questions involving searches of motor cars or other things readily moved cannot be treated as identical to questions arising out of searches of fixed structures like houses. For this reason, what may be an unreasonable search of a house may be reasonable in the case of a motor car. See Carroll v. United States, 267 U.S. 132 at 153, 45 S.Ct. 280 at 285, 69 L.Ed. 543. But even in the case of motor cars, the test still is, was the search unreasonable." 376 U.S. at 366, 84 S. Ct. at 883.

It is therefore clear that searches of motor cars must meet the test of reasonableness under the Fourth Amendment before evidence obtained as a result thereof is admissible. Assuming that the arrest in question was not lawful but was merely a subterfuge or pretext used to search Speake's Volkswagen micro-bus which permission had been previously refused by him, the next question to be decided is whether the school authorities had probable cause to search and whether the search was reasonable under the circumstances. In a landmark decision, the United States Supreme Court in Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), approved warrantless searches of automobiles not incident to arrest where unforeseen circumstances give the police probable cause to search. A majority of the U. S. Court of Appeals for the District of Columbia Circuit has more recently upheld the warrantless search of an assault suspect's car even though the search may not have been incident to his arrest and was made at a time when he was 15 feet from his car and under police control at the time. United States v. Free.[27] In *Free* the Court of Appeals observed that *Chambers* approved of warrantless searches of automobiles not incident to arrest where unforeseen circumstances give the police probable cause to search. The Court of Appeals recognized a significant distinction, for privacy purpose, between an automobile and a home just as did Justice Black, the author of the *Preston* opinion. The Court in *Free* stated that while the home is a place of repose from the outside world including the world of government officials, ordinarily an automobile is essentially a means of transportation on the public way, and one

---

See also United States v. Williams et al., 416 F.2d 4, (C.A.5, 1969), in which the United States Court of Appeals for the Fifth Circuit in affirming the United States District Court for the Northern District of Mississippi, held that under Mississippi law, an officer may search a car after the lawful arrest of the driver

for a traffic violation (citing Watts v. State, Miss., 196 So.2d 79 (1967) and Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) which allows seizure of evidentiary material as well as the fruits or instrumentalities of a crime.

27. 7 Cr.L. 1085 (Aug. 12, 1970).

which in large part exposes the vehicle and its contents to view.

There was probable cause in the case sub judice for the search and seizure complained of. As previously stated, approximately 150 of these leaflets in question were placed under the doors and posted on bulletin boards in the three men's dormitories at the University of Southern Mississippi either late on the night of May 17 or in the early morning of May 18, 1970. A Volkswagen microbus the same color as Speake's was seen by a night watchman pulling away from the back door of Elam Arms, one of the dormitories in question, early on the morning of May 18; despite the fact that examinations were to begin on May 20, this micro-bus was being operated by Speake with the other plaintiffs as passengers therein during the night of May 17 and into the early morning of May 18 when the students would normally be studying for final examinations; the observance by Dean Grantham and Chief Oubre of Richard Peters, one of the plaintiffs herein, who left the micro-bus of Speake in front of Scott Hall, having earlier left the Newman Center at approximately 1:30 A.M. on May 18th, with a stack of approximately 100 leaflets comparable in size to the ones in question and who proceeded onto campus at that time with these leaflets; other students had left the Newman Center at intervals in close proximity to the time that Peters left and they also had leaflets of paper similar to the ones in question; the micro-bus did proceed to the Newman Center where it was subsequently searched. According to Mr. Oubre, Director of Security, this was the only Volkswagen micro-bus this color registered on or ever seen by him on the University campus or in the City of Hattiesburg, Mississippi, where the University is located; at 2:30 A.M. Dean Grantham and Mr. Oubre observed Speake's micro-bus occupied by the plaintiffs near the door of Scott Hall, where a considerable number of these leaflets had been previously posted, and observed several other students leaving this bus; Speake twice refused to permit a search of his micro-bus on the campus when requested by Dean Grantham and later Mr. Oubre; and more importantly, after the micro-bus had come to a stop in front of the Newman Center, Lonnie Shoultz looked through the window and saw in plain view the stack of approximately 200 pamphlets or leaflets sticking out from under the front seat of this micro-bus, which were subsequently seized by him pursuant to the instructions of Chief Oubre. The Court is therefore of the opinion that there was and is substantial evidence to support the Board of Trustees' finding that there was probable cause for the search in question, if in fact this was considered a search and seizure within the framework of the Fourth Amendment.

■■■ This Court is of the opinion that the seizure of these approximately 200 leaflets was justified under the "plain view" rule as it appears in *Miller v. United States* [28] and *Harris v. United States.* [29] In *Harris*, incriminating evidence was discovered in the defendant's car after it had been impounded by the police. The search which produced the evidence was found to be lawful because it was made pursuant to a police department regulation designed to protect the care and any valuables it contained. The Court stated the "plain view" rule as follows:

> "It has long been settled that objects falling in the plain view of an officer who has a right to be in a position to have that view are subject to seizure and may be introduced in evidence. Ker v. State of California, 374 U.S. 23, 42–43, 83 S.Ct. 1623, 1634, 1635, 10 L.Ed. 726, 743 (1963); United States v. Lee, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927); Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924)."

28. 356 F.2d 63 (C.A.5, 1966), cert. den. 384 U.S. 912, 86 S.Ct. 1357, 16 L.Ed. 2d 365 (1966).

29. 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

Many of the cases involving the "plain view" doctrine concern evidence recovered from automobiles located in public places. The rule lends itself to application in these situations because the observing officer is not required to trespass on private property in order to have a clear view of articles inside an automobile.[30] In view of the fact that the witness Lonnie Shoultz at the time that he observed the leaflets in plain view inside the micro-bus while looking through the window thereof, was on Newman Club property, which was at least quasi public property, and was not trespassing on any property in which any of the defendants had any interest, possessory or otherwise, at the time that he so observed these leaflets, the "plain view" doctrine would, in this Court's opinion, justify the seizure and introduction in evidence of the leaflets in question.

Because of the foregoing reasons, the leaflets obtained from the micro-bus of the plaintiff Speake were properly received in evidence by the Board of Trustees.

### B. The Regulations and The Notice

In substance, plaintiffs contend that the charges against them and the rules and regulations of the University which form the basis of these charges are unreasonable and are unconstitutional because of vagueness and overbreadth, and thus, deny the plaintiffs substantive due process; furthermore, that this Court's previous order requiring compliance with procedural due process was violated and that the plaintiffs were deprived of due process in view of the fact that the writ-

ten notice of the charges against them and of the hearing informed them that they were charged with violating only Rule 1 of the Standards of Student Conduct contained in the official school publication "Drawl", but at the hearing before the Board of Trustees, plaintiffs discovered to their surprise and prejudice that they were also being tried for violating Rule 18;[31] and furthermore, that both rules constitute a violation of the Fourteenth Amendment to the Constitution of the United States inasmuch as they abridge the privileges and immunities of citizens of the United States.

■■■■■ It is not necessary that a University have a specific regulation providing for disciplinary action for the possession of false and inflammatory literature. The University had inherent authority to maintain order and to discipline students.[32] However, an institution may establish appropriate standards of conduct, both scholastic and behavioral, in any form and manner reasonably calculated to give adequate notice to the scholastic attainments and behavior expected of the student. The notice of these standards may be written or oral, or partly written and partly oral, but preferably written and may be positive or negative in form.[33] In this case, the defendant University has adopted disciplinary rules and regulations in writing and promulgated them in such manner as to reach all parties subjected to their effects by incorporating them in the official University publication, "Drawl", as was recommended by the United States District Court in Zanders v. Louisiana State Board of Education.[34] As stated in

---

30. See United States v. Davis, 423 F.2d 974 (C.A.5, 1970); Marshall v. United States, 422 F.2d 185 (C.A.5, 1970); Agius v. United States, 413 F.2d 915 (C.A.5, 1969); Creighton v. United States, 132 U.S.App.D.C. 115, 406 F.2d 651 (1968); Miller v. United States, 356 F.2d 63 (C.A.5, 1966).

31. See Exhibit "E" admitted at the Board hearing:
Rule 1: "Obstruction or disruption of teaching, research, administration, disciplinary procedures, or other University activities, including the University's pub-

lic service functions or of other authorized activities, on University owned or controlled property."
Rule 18: "Poor citizenship standards in any community."

32. Norton v. Discipline Committee of East Tennessee State University et al., 419 F. 2d 195, 200 (1969).

33. Memorandum of the United States District Court for the Western District of Missouri, en banc, 45 F.R.D. 133, 146 (1968).

34. 281 F.Supp. 747, 761 (1968).

*Zanders,* this action by the University evidences one more sign of its taking the initiative carefully to safeguard the basic rights of the student as well as its own position, prior to disciplining him for misconduct. This Court is of the opinion that no constitutional right of the plaintiffs has been infringed because disciplinary action was taken against them pursuant to these regulations. There are several bases for this finding of the Court. First, as the United States Court of Appeals for the Sixth Circuit stated in Norton v. Discipline Committee of East Tennessee State University, *supra,* at p. 200, it was not necessary to have a specific regulation providing for the disciplinary action for the possession and posting of the type literature in question because the University had inherent authority to maintain order and to discipline students. Therefore, the University was not required to have written regulations nor base its charges against these plaintiff students on its written rules or regulations. Certainly, the charges against the plaintiffs were very clearly and concisely set forth in the notice given to them, and the mere fact that Rule 18 as well as Rule 1 was not specifically mentioned nor referred to by number, was not a sufficient basis for them to claim surprise and prejudice, inasmuch as there was no confusion or unawareness on their part in either case. The exercise of common sense is all that was required. Each plaintiff as a reasonably intelligent college student certainly was given adequate, sufficient and reasonable notice of what he was charged with and certainly he knew what he was doing and knew the consequences thereof. Secondly, it is not sound to draw an analogy between student discipline and a criminal procedure; the standard of conduct which a college seeks to impose must be one relevant to a lawful mission, process or function of the educational institution,[35] and the attempted analogy of student discipline to criminal proceedings against adults and juveniles is not sound.

Thirdly, as stated by then Judge, now Justice Blackmun, in *Esteban,* we do not find the regulation at all difficult to understand and are positive that the plaintiffs herein who are college students and are expected to possess some minimum intelligence would not find them so difficult. They ask merely for the adherence to standards of conduct which befit a student. We assume that the plaintiffs can read and possess some power of comprehension. As then Judge Blackmun, author of the opinion in *Esteban* stated: "Their difficulty was that they chose not to read or not to comprehend."

The plaintiffs have failed to convince this Court that the rules or regulations in question are overly broad or vague. The plaintiffs here are not attacking a state statute.[36] Rather, here

35. Esteban v. Central Missouri State College, *supra.*

36. *cf.* Hiett v. United States, 415 F.2d 664 (C.A.5, 1969) in which the Court of Appeals for this Circuit laid down the test by which to measure or determine the constitutionality of a statute in a criminal prosecution. The Court stated that the criminal statute is constitutional only if either (1) it meets the twin test of specificity and narrowness or (2) the expression it affects is not protected speech. It went on to state that a criminal statute affecting expression protected by the First Amendment must meet two stringent requirements. The first of these is the test of specificity: the statute must be held void for vagueness unless it de-

fines the area of illegal conduct with sufficient specificity so that "men of common intelligence need not guess at its meaning" * * * A second test of a statute regulating speech is that it may not encroach unduly upon protected First Amendment interest. This doctrine of overbreadth is closely related to the vagueness doctrine because indefinite laws tend to be overly broad as well, in that they not only provide insufficient notice of illegality but sometimes include within their prohibitions expression that is protected speech. The Court went on to say that it seems clear that although "pure" speech is to be accorded comprehensive, perhaps even absolute, protection only by the clear and present danger test, protection accorded speech is not so great

the attack is upon student regulations found in an official University publication or handbook. No case is cited to this Court which has upheld the attack upon a student regulation as being unconstitutionally vague. The University has inherent general power to maintain order and to enforce reasonable rules of student conduct.[37] University regulations for students, because of the very nature of the institution and its goals and purposes, should not be tested by the same requirements of specificity as are state statutes.[38] These regulations are codes of general conduct which those qualified and experienced in the field have characterized not as punishment but as part of the educational process itself and as preferably to be expressed in general rather than in specific terms.[39] Certainly, universities have inherent authority to maintain order and to discipline students and should have latitude and discretion in the formulation of their rules and regulations and of general standards of conduct. Goldberg v. Regents of University of California, 248 Cal.App.2d 867, 57 Cal.Rptr. 463, 472 (1967). Unless university and college officials have authority to keep order, they have no power to guarantee education. The power of the authorities to oversee, to formulate rules and regulations, and to rule is a necessary element in order to provide and promote education. Consequently, the judiciary must exercise restraint in questioning the wis-

dom of specific rules and the manner of their application, since such matters are ordinarily the product of school administrators rather than the courts.[40] In formulating regulations, including those pertaining to the discipline of school children, school officials must have wide latitude of discretion. But the school is always bound by the requirement that the rules and regulations must be reasonable. It is not for the courts to consider whether such rules are wise or expedient, but merely whether they are a reasonable exercise of the power and discretion of the school authority. Regulations which are essential in maintaining order and discipline on school property are reasonable; that is, if they are necessary for the orderly presentation of classroom activities or contribute to the maintenance of order and decorum within the educational system or contribute to the proper operation of public school systems, which is one of the highest and most fundamental responsibilities of the state they are necessary and reasonable.[41]

Under the circumstances of this case, we consider the rules and regulations in question reasonable, the charges against the defendants clear and adequate notice of the conduct which was considered to constitute interference with the orderly educational functions and procedures of the defendant University, and sufficiently definite and clear so as not to

---

when it is coupled with "conduct". In the latter case of "nonpure" speech the Court stated that it is required to balance the harm done by the overbreadth and vagueness of the statute against the legitimate interests the legislature was seeking to protect, to see whether those interests are so overwhelming as to justify the encroachment.

37. Goldberg v. Regents of University of California, 248 Cal.App.2d 867, 57 Cal. Rptr. 463 (1st Dist., 1967).

38. Jones v. State Board of Education of and for the State of Tennessee et al., 279 F.Supp. 190, 202 (M.D.Tenn.1968), affd. 407 F.2d 834 (C.A.6, 1969).

39. Esteban v. Central Missouri State College, *supra*, 415 F.2d, at p. 1088; E. Wil-

liamson and J. Foley, Counseling and Discipline, pp. 79–83 (1949); E. Williamson, Student Personnel Services in Colleges and Universities, p. 166 (1961); Birdie and Snoxell, Student Discipline in Higher Education, 10 (Student Personnel Series No. 5, The American College Personnel (1965)).

40. Barker v. Hardway, 283 F.Supp. 228, 235 (S.D.W.Va.1968) affd. 399 F.2d 638 (C.A.4, 1968), cert. den., 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217.

41. Burnside v. Byars, 363 F.2d 744, 748 (C.A.5, 1966); Blackwell v. Issaquena County Board of Education, 363 F.2d 749, 753–754 (C.A.5, 1966).

violate any constitutional right of the plaintiffs guaranteed by the United States Constitution or any Amendments thereto or any other law, either state or federal. It is not the function of this Court to consider whether such rules are wise or expedient, but merely whether they are a reasonable exercise of the power and discretion of the school authorities. For the foregoing reasons, this Court finds that the above charges, notice and regulations are not to be measured by the standards which prevail for the criminal law and for criminal procedure; and this Court and others should not interfere unless there is a clear case of constitutional infringement, which is not found herein. Thus, plaintiffs' contention in this regard is completely without merit.

### C. First Amendment Rights

In this regard, plaintiffs contend that simple possession of the leaflets in question constitutes no ground for punishment and is protected by the First Amendment to the United States Constitution.

The right to freedom of speech, along with other First Amendment rights is, of course, an indispensable democratic freedom secured to all by the First Amendment to the Constitution. These freedoms are given a preferred place in our scheme of government or democracy, that is, a priority providing a sanctity and a sanction not permitting dubious intrusion. The right to the due process clause of the Fourteenth Amendment. The action of the authorities in question, who were employees of the state by virtue of the fact that they were employed by the state-owned and controlled and tax-supported institution, were state officials or officers.

The plaintiffs contend that possession of the leaflets was privileged under the First Amendment to the Constitution as an expression of free speech when unaccompanied by any acts of violence or any other type acts and apparently principally rely on Tinker v. Des Moines Independent Community School Dist., 393 U. S. 503, 89 S.Ct. 733, 21 L.Ed. 731 (1969) and cases cited therein. Although *Tinker* involved high school children who merely wore black armbands to publicize objections to the Viet Nam conflict, and did nothing to interfere with or designed to interfere with school activities, the conduct of classes nor to show disrespect to their teachers. In upholding the contention of the students, the Supreme Court painstakingly stated the following:

> "As we have discussed, the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred." *Id.* at 514, 89 S.Ct. at 740.

In *Tinker*, the Court in holding that it could hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the school house gate, then significantly went on to state the following:

> " * * * On the other hand, the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of the school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools. * * * Our problem lies in the area where students in the exercise of First Amendment rights collide with the rules of the school authorities. * * * Our problem involves direct, primary First Amendment rights akin to 'pure speech'.

> * * * * * *

> "The school officials banned and sought to punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners. There is here no evidence whatsoever of petitioners' interference, actual or nascent, with the school's work or of collision with the rights of other students to be secure and to be let

alone. Accordingly, this case does not concern speech or action that intrudes upon the work of the schools or the rights of other students.

\* \* \* \* \* \*

" \* \* \* Certainly where there is no finding and no showing that engaging in forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of a school,' the prohibition cannot be sustained.

\* \* \* \* \* \*

" \* \* \* But conduct by the student, in class or out of it, which for any reason—whether it stems from the time, place or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.

\* \* \* \* \* \*

"As we have discussed, the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred." 393 U.S. 505, 507–509, 512–514, 89 S.Ct. 737, 738, 740.

 It is obvious that where there is actual or *potentially* disruptive conduct or disruption or disturbance by students, or interference with the work of the school or the rights of other students or substantial disorder, then reasonable action by school authorities is constitutionally permitted. Of course, there must however be more than mere fear and apprehension of possible disturbance. Esteban v. Central Missouri State College, *supra*, 415 F.2d at p. 1087.

As was stated by the Court of Appeals for the Fifth Circuit in Burnside v. Byars, *supra*, 363 F.2d at p. 749:

" \* \* \* Obedience to duly constituted authority is a valuable tool, and

respect for those in authority must be instilled in our young people."

So also, in Blackwell v. Issaquena County Board of Education, *supra*, the Court of Appeals for the Fifth Circuit stated:

"It is always within the province of school authorities to provide by regulation prohibition and punishment of acts calculated to undermine the school routine. This is not only proper in our opinion, but is necessary.

\* \* \* \* \* \*

" \* \* \* The Courts are required to 'weigh the circumstances' and 'appraise the substantiality of the reasons advanced' which are asserted to have given rise to the regulations in the first instance. Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). The constitutional guaranty of freedom of speech 'does not confer an absolute right to speak' and the law recognizes that there can be an abuse of such freedom. The Constitution does not confer 'unrestricted and unbridled license giving immunity for every possible use of language and preventing the punishment of those who abuse this freedom.' "

It has been recently stated that:

"Thus the touchstone of the application of due process are reasonableness and fairness in view of all the facts and circumstances of the particular case. \* \* \* And it may be noted in passing that the law indulges the presumption that school authorities act reasonably and fair and in good faith in exercising the authority with which it clothes them and casts the burden on him who calls their conduct into question to show that they have not been activated by proper motives. 47 Am.Jur.2d Schools, Sec. 188, p. 435." [42]

It is necessary then to carefully consider the language employed in and the purpose of the leaflets in question and

---

**42.** See Barker v. Hardway, 283 F.Supp. 228, 237, affd. 399 F.2d 638 (C.A.4, 1968).

the effect or potential effect that they had or would have had on the proper and orderly functions of the University of Southern Mississippi and on the rights of their fellow students, and then to determine whether they disrupted or would have potentially disrupted or materially interfered wtih school activities or the rights of other students. The language of the leaflets clearly and unmistakenly stated: "Due to the Violence at Jackson State and the Critical Situation on Our Campus CLASSES ARE SUSPENDED Monday, May 18 and Tuesday, May 19." It is very clear that these notices or leaflets containing false information with reference to the suspension of classes referred to the violence which occurred on the Jackson State campus in Jackson, Mississippi, and the unfortunate death of several students. By the very nature of these pamphlets which referred to and used the word "violence" and which also attempted to create the impression that there was a critical situation existing on the defendant University's campus, these leaflets were inflammatory or at least possessed the potentiality of being inflammatory and sought to create a condition of uneasiness and turmoil. In addition, they falsely stated that classes were suspended on the last two days prior to final examinations, which were times when many reviews were to be held in classes and many professors would probably discuss with their students what the examinations would consist of or cover. They were also times when tranquility and opportunity for quiet and uninterrupted study and activity were absolutely necessary.

The undisputed testimony at the Board hearing of Dean Charles Moorman, who, as Dean of the University and next in authority to President McCain and Chief Academic officer of the defendant University, vividly illustrates the effect or potential effect of these leaflets:

"Q. Dr. Moorman, as Dean of the college, was this information contained on the leaflet correct?

A. No.

Q. In your position as Dean of the college, if such a notification of false information had been made known to a large segment of students, what effect do you think, it would have had?

A. Well it would have been disruptive, chaotic, coming when it did and under the circumstances.

Q. Explain that.

A. Well several things were involved. The situation at Jackson State had resulted in some up-tightness on the campus. There were items all over the television of colleges shutting down over the country by the dozens. At the end of spring quarter two days before the exams a good many students would have welcomed an opportunity to go home or at least to disappear before exams. In other words, it could have triggered academic chaos on this campus. We could have had students just disappear, whether it were official or not, I really do not feel that the students would have waited around to see if this was official.

Q. Would this have affected accreditation or anything?

A. Of course. Here we are, we don't finish the quarter, exams were not given. How could we give credit? It could have been a completely wasted quarter for all students. No students could have graduated, this kind of thing. It brings in all kinds of academic problems." (Tr. pp. 17–18)

Further on cross examination Dr. Moorman was asked the following questions and gave the following answers thereto:

"Q. It is true that there were no exams on the 18th and 19th, that the exams were set for the 20th, 21st and 22nd?

A. Uh-huh.

Q. So there were not any the 18th and 19th and exams would not have been affected * * *

A. But classes were still going on.

Q. It would have affected classes then.

A. That's right, and you understand, these are unusually important classes in

a quarter. It is immediately preceding exams.

Q. And the administration's hands would have been tied, there would have been no way the administration could have avoided or alleviated chaotic conditions as a result of students boycotting or missing classes on May 18th and 19th?

A. If you had had a general student exodus because of this notice I don't know how you could have collected the campus together for exams.

Q. The notice said the 18th and 19th. It didn't say the balance of the quarter.

A. How could you have gotten the students back for exams if they had taken off?

Q. Dr. Moorman, the notice, as I understand it, said classes are suspended on the 18th and 19th, and if a student paid attention to the notices and said classes were suspended he had a great many things he could do, such as spend that time in his room studying instead of in class; but I will go along with you, I used to be a college student, and I agree that most of them would have left campus without questioning too much whether the notice was official or not. I would have, in fact, when I was a student. But if they had followed the notice and taken out it would have been for the 18th and 19th, and wouldn't they have come back?

A. I don't know, Mr. Sullivan. This was an unusual time when campuses all over the country were shutting down and it seems to me that under those circumstances it would have been difficult to reassemble the students. There are all sorts of technicalities involved. We always hold so many class hours during a quarter to remain accredited. There were all sorts of things to consider here which made it a very serious situation simply to cut loose for two days.

Q. Now Dr. Moorman, if it were that serious, as far as you being accredited couldn't the college have done something about making up those two days?

A. In all honesty, I do not know how. You just cannot reassemble sixty-five hundred or so people to hold a couple of extra classes you have missed somewhere.

Q. You keep using the word reassemble, Dr. Moorman. After the spring holidays you don't have to reassemble. In other words, if you were open on the 20th you wouldn't have to reassemble students. If they did as the notice said, wouldn't they have been back in class on the 20th?

A. That I don't know. If they are going to act on a notice bearing no official signature, I just don't know what would have happened.

Q. During the spring quarter had the University used up all of its allowable days under the accrediting process?

A. I don't know.

Q. You don't know?

A. No.

Q. You normally don't meet the bare minimum for accrediting, do you? Don't you normally have some surplus days to be on the safe side?

A. Of course you have to, sure.

Q. And if you had had any surplus days by the 18th and 19th of May no chaos would have happened as a result of the notice, would it?

A. You misunderstand that. At the time I did not go and immediately check to see how many days grace we had. I bring about the statement about the accreditation with the Southern Association as one among other reasons that we would have had academic disruption.

Q. When you made the statement that it would have created chaos—

A. I said this was a factor that could have.

Q. Then the fact is that it could have affected your accreditation with the Southern Association, that that is just a possibility.

A. Yes, and if you include the fact that these classes were very important just preceding exams, and the examination period was in just a couple of days.

Q. You also said it could have resulted in a completely wasted quarter.

A. Yes, and this I understand, by the way, is quite a problem with those schools that did dismiss.

Q. Don't you consider that statement just a little bit overdone?

A. All right. What I had in mind is simply this. If you end up with a large number of students not taking the examinations and thereby finishing courses you cannot give them credit for the course. Therefore, you would have ended up with a rather large number, * * * presuming what I say is right, you would have ended up with a substantial number of students not receiving credit because they didn't finish the course. This would mean that a substantial number of senior students would not have graduated." (Tr. pp. 23–26)

* * * * * *

"Q. Now Dr. Moorman, I remember you saying that due to the thing at Jackson State and Kent State and reactions over the rest of the nation that there was an up-tightness on the campus.

A. No, I did not mean to give that impression, that there was an up-tightness on the campus generally. I think among the black students there certainly was.

Q. Yes; but this was by and large,— this whole time we are talking about was by and large black students, wasn't it? They were the ones up-tight and they were the ones demonstrating?

A. By and large black students, but with a number of white students also.

Q. Now at the same time the black students got up-tight didn't the administration of the campus, yourself and campus security, Dr. Durkee and Dean Grantham, didn't a large number of the administration also get up-tight?

A. I would't call it up-tight, no. We got apprehensive, I think, would be the best word. You do. You are paid to get apprehensive. Here is a situation which could conceivably develop into unrest on the campus, so you watch it very carefully." (Tr. pp. 27–28)

On redirect examination the following questions were asked and answers elicited:

"Q. Dr. Moorman, you are concerned as Dean of the college, are you not, about any activity that might disrupt the normal process of obtaining an education?

A. Yes.

Q. Wasn't this following Monday the 18th following dead week? What is that?

A. Dead week is the week or period immediately preceding examinations. The term simply means that we as far as possible schedule nothing during that time of entertainment, speakers or anything like that so that the students may study.

Q. Particularly as to the two days referred to in the leaflets May 18th and 19th, do some professors have the option of giving the finals early?

A. They are not supposed to, no.

Q. Do some of them conduct a specific review of finals say during the last few days before finals?

A. Yes, a great many of them make an effort to do this.

Q. Some students, I gather, usually like to wait until the last minute, really these two days were more important than the actual taking of the examinations, were they not?

A. I tried to stress this before, yes, these are very important classes and very important days academically.

Q. So if students were not attending classes at this time it would have been disruptive?

A. Yes." (Tr. pp. 30–31)

The character of every act depends upon the circumstances in which it

is done.[43] It is not required that college authorities delay action against those who would disrupt the academic process or interfere with the orderly conduct thereof or the rights of other students until after the action has been taken and the damage inflicted. As the Court said in *Norton, supra*, "the college authorities had the right to nip such action (riotous conduct) in the bud and prevent it and its inception. This is authorized even in criminal cases." Id. 419 F.2d at 199. As Chief Justice Vinson said in Dennis v. United States, 341 U.S. 494, 509, 71 S.Ct. 857, 867, 95 L.Ed. 1137 (1951):

> "Obviously, the words cannot mean that before the Government may act, it must wait until the putsch is about to be executed, the plans have been laid and the signal is awaited. If Government is aware that a group aiming at its overthrow is attempting to indoctrinate its members and to commit them to a course whereby they will strike when the leaders feel the circumstances permit, action by the Government is required."

▪ It is obvious that the plaintiffs in this case were not punished because they exercised their First Amendment rights, inasmuch as the Board of Trustees found from the evidence before them just as this Court does, based on the Transcript of the Board Hearing and the other evidence before it, that the possession of the leaflets by these plaintiffs, assuming at this time that the proof thereof is sufficient, promoted or potentially promoted unrest and posed the potential threat of disruption of normal educational activities at the University to the detriment of both the University and all other students attending it. As Dean Moorman stated, suspension or disruption of classes on the two very important days prior to the final examinations, when many professors were reviewing the courses and discussing the coming examinations, the problem involved in having all students return to the University in time to take their examination, the tense situation which did exist on the campus, and the potential danger of some students not graduating and others not receiving credit, would certainly have constituted a grave and potential threat to the orderly functions and business of this University and the valuable rights of its students. Therefore, the plaintiffs were not punished because they exercised their First Amendment freedoms. The record of this case supports the conclusion that the disciplinary punishment imposed is not an attempt to suppress the plaintiffs' First Amendment rights but merely an effort to control and regulate conduct which would obstruct the educational functions of the University of Southern Mississippi and interfere with the educational opportunities of all its students.

It has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced or carried out by means of language either spoken, written or printed.[44]

▪ First Amendment rights are not a license to trample upon the rights of others. They must be exercised responsibly and without depriving others of their rights, the enjoyment of which is equally precious. Baines v. City of Danville, 337 F.2d 579 (C.A.4, 1964); Barker v. Hardway, *supra*, 283 F.Supp. 228 at pp. 238–239.

### D. Punishment for Political and Racial Beliefs

Plaintiffs contend that they are being punished because of their political and racial beliefs and that the actions of the defendants were unreasonable, arbitrary and racially motivated, in violation of the First and Fourteenth Amendments to the United States Constitution.

---

43. Aikens v. Wisconsin, 195 U.S. 194, 195, 205, 206, 25 S.Ct. 3, 49 L.Ed. 154 (1904).

44. Giboney v. Empire Storage and Ice Co., 336 U.S. 490, 502, 69 S.Ct. 684, 691, 93 L.Ed. 834 (1949).

If there was any basis whatsoever for this contention in the record before it, this Court of course would devote much more time and effort in discussing this contention. However, there is no evidence in this record to support either the political or racial charge or allegation.

■ There is a complete absence of any evidence of any political motivation, or punishment because of any political belief by the plaintiffs. The only racial overtone or possible racial question in this case is the fact that there was a reference to the Jackson State tragedy involving the deaths of some black students and the fact that one of the four plaintiffs herein was black, the other three being white. There is no basis in fact or in law for any allegation that plaintiffs were being punished because of their racial beliefs or that the action of the University through its officials was arbitrary, unreasonable or racially motivated. See Barker v. Hardway, 283 F.Supp. 228, at 238.

It is very clear from the record before this Court that there is not only an absence of a denial of freedom of speech, but that the actions of the defendants herein were in no way racially motivated; that they did not institute action against nor punish the plaintiffs nor any of them because of their political or racial beliefs. There is no conflict between black students and University officials, or black students and white students, or students of one political belief with the University officials or with students of another belief, but rather a conflict between certain students, white and black, on the one hand, and the college administrators on the other, for supremacy in the field of school policy and school administration. Therefore, these contentions by the plaintiffs are completely unfounded.

### E. Equal Protection

■ Although plaintiffs do not specifically allege that they were denied equal protection of the law, nevertheless, they do state in their Motion for Further Relief, that Rules or Regulations 1 and 18 violate the Fourteenth Amendment to the Constitution of the United States inasmuch as they constitute an "abridgement of the privileges and immunities of citizens of the United States," and in the hearing before this Court, plaintiffs' attorney did complain that although other students were passengers in, or occupants of, the Volkswagen micro-bus in question, that they were not subjected to disciplinary punishment, and thus, the plaintiffs were singled out for punishment.

This contention of the plaintiffs is, in this Court's opinion, fully and adequately answered and rejected by the language in the opinion of the United States District Court for the Western District of Louisiana in the case of Zanders v. Louisiana State Board of Education, *supra*, 281 F. Supp., at pp. 766–767, with which this Court agrees:

"Finally, upon cross-examination it was suggested that the sole basis of expulsion of these students was their attendance at the October 26 meeting between the 'leaders' and the administration. While we do not agree that this was the sole, or only valid, basis for their expulsions, proof of the correctness of that allegation woud not render the expulsions invalid (cases cited).

"Those plaintiffs, who were not reinstated by us, have admitted their participation in blocking the administration building and have admitted that this was an illegal method of demonstration.

"Analogous cases in the field of labor law are replete with instances especially in 'wildcast strike' situations, where the 'leaders' of these illegal strikes were singled out from huge numbers and discharged from their employment because of their leadership, instigation, or their participation in these activities (cases cited). An employer is not relegated to discharging an entire work force in an effort lawfully to restore order to a business as a result of an illegal labor practice. By the same process of reasoning, surely college officials are not relegated to

dismissal of an entire student body, or a large portion thereof in order to stop illegal activities and restore order on their campus, especially when the instigators are leaders of such activity can be definitely identified and removed, as here.

\* \* \* \* \* \*

"The wide discretion traditionally given school officials in administration of their affairs has been affirmed numerous times. Such discretion also exists in the hands of public officials administering enforcement of criminal laws. This discretion has been granted by statute and has been upheld in our jurisprudence, most recently, within our own Circuit. (cases cited) Where there is no abuse of discretion inherent in the responsibility of such officials, courts will not intervene to inquire as to the reasons why prosecution was instigated against some and not all, especially where no particular 'class', such as in Yick Wo v. Hopkins, supra, was involved. Again we note, as above, that the plaintiffs who were not reinstated were not members of a particular 'class', as such.

\* \* \* \* \* \*

"No abuse of their discretion has been shown here. Those plaintiffs, whose expulsions have been upheld by us, clearly were justifiably expelled, and they cannot be heard to complain that the whole student body was not also expelled.

"Accordingly, we find and hold that plaintiffs' first cause of action is solely without merit."

In *Zanders*, the Court analogized between the rights of school officials to bring disciplinary action and the right and prerogative of District Attorneys to institute prosecution against some and not others, and to determine whom, when and how he shall prosecute.[45]

In Jones v. State Board of Education of and for the State of Tennessee,[46] the

Court also rejected a similar contention, holding that the facts therein did not support plaintiffs' contention that they were invidiously and arbitrarily discriminated against and that although it may well be that the Faculty Advisory Committee in the exercise of its discretion decided not to punish other students guilty of similar conduct, there was no evidence to indicate that the decision to punish the plaintiffs and not others was not reasonably and fairly made.

Therefore, this contention of the plaintiffs is, for the foregoing reasons, found to be without merit and rejected.

### F. Disciplinary Punishment—Cruel and Unusual Treatment

Plaintiffs next attack the disciplinary punishment imposed on them on the ground that it constitutes a cruel and unusual form of punishment in violation of their rights under the Eighth Amendment to the United States Constitution.

■■■ It is now firmly established that within limits of due process, institutions must be free to devise various types of disciplinary procedures relevant to their lawful missions, consistent with their bearing, processes and functions, and which do not impose unreasonable strain on their resources and personnel. Not only does a university or college have the inherent power to promulgate reasonable rules and regulations but that it also has the inherent power properly to discipline.[47] The memorandum of the United States District Court for the Western District of Missouri, en banc, previously cited herein, states the following:

"The discipline of students in the educational community is, in all but the case of irrevocable expulsion, a part of the teaching process. In the case of irrevocable expulsion for misconduct, the process is not punitive or deterrent in the criminal sense, but the process is rather the determination that the

---

45. Id. 279 F.Supp. at 767, fn. 51.

46. 279 F.Supp. 190, 203 (1968), affd. 407 F.2d 834 (C.A.6, 1969).

47. Esteban v. Central Missouri State College, *supra*, 415 F.2d, at p. 1089.

student is unqualified to continue as a member of the educational community. Even then, the disciplinary process is not equivalent to the criminal law processes of federal and state criminal law. For, while the expelled student may suffer damaging effects, sometimes irreparable, to his educational, social and economic future, he or she may not be imprisoned, fined, disenfranchised, or subjected to probationary supervision. The attempted analogy of student discipline to criminal proceedings against adults and juveniles is not sound." [48]

A recent opinion of the Sixth Circuit Court of Appeals expounded upon the difference between expulsion and suspension in the following language:[49]

"Finally, it should be emphasized that appellants were not expelled from the University, but were merely suspended. The difference between expulsion and suspension was explained by Dr. Davis as follows:

'I continue to hear reference to the matter of expel or expulsion. We at no time even mentioned the word expel or expulsion.

'The plan of suspension is a restraint from enrollment which gives those of us who are concerned with the administration affairs time to reflect and study what has happened. It also gives the students time to reflect and to study, and to appear before the Committee then so that the Committee and the student can, if possible come to an agreement about future attendance.

'There is a difference in the meaning of suspension and expulsion.' "

 In the opinion of this Court, there is no basis whatsoever for plaintiffs' claim of denial of Eighth Amendment rights or for this Court's interference with the disciplinary procedures of the University. As this Court has

previously held in Brown v. Greer, 296 F.Supp. 595 (S.D.Miss., 1969), it will not second-guess the school board nor act as a super school board and substitute its judgment for that of the Board of Trustees herein with reference to the appropriate disciplinary punishment of the plaintiffs, provided there is sufficient evidence to substantiate the Board of Trustees' finding of their guilt of the charges brought against them, because the Board is in the better position to determine appropriate and necessary disciplinary punishment. In any event, this Court finds the punishment imposed to be fair and reasonable for the offenses of possession of this material and the false denial by the plaintiffs of any knowledge whatsoever of the existence of the leaflets or their presence in the micro-bus.

### G. Sufficiency of the Evidence

 A Federal Court should not intervene in or interfere with reasonable disciplinary action taken by a university or college pursuant to its primary lawful mission as an educational institution, namely, to teach and educate in an atmosphere or surrounding conducive thereto, unless there appears either a denial of a student's constitutional rights or that the action of the educational institution in imposing disciplinary punishment is clearly unreasonable, arbitrary or capricious. It cannot be gainsaid that the courts should exercise caution when importuned to intervene in important processes and functions of teaching and education, and as previously said by this Court in Brown v. Greer, 296 F.Supp. 595, at page 602, should not second-guess school officials or substitute its judgment for theirs and thus act as a "super school board".

 However, it is equally important that no disciplinary action be taken against students on grounds which are not supported by substantial evidence.

---

48. 45 F.R.D. 133, 142.

49. Norton v. Discipline Committee of the East Tennessee State University, *supra,* 419 F.2d, at p. 200.

It would not be consistent with procedural fairness for the Court to sustain findings of the school disciplinary body found to be arbitrary and capricious and not based on substantial evidence.[50]

Many years ago, it was stated by an Ohio Appellate Court:[51]

" * * * (school authorities) should be careful in receiving evidence against (a student); they should weigh it and determine whether it comes from a source freighted with prejudice; determine the likelihood, by all surrounding circumstances, as to who is right, and act upon it as jurors, with calmness, consideration and fair minds. When they have done this and reached a conclusion, they have done all that the law requires of them to do."

With the above principles in mind, we now turn to the evidence of record to determine whether the Board of Trustees had before it sufficient evidence to support the disciplinary action taken against each of the plaintiffs herein, and in this regard, the Court must look at the totality of the evidence rather than view it in completely unrelated segments.

Apparently, the first event which occurred on the defendant University's campus, which ultimately resulted in the suspension of the plaintiffs, was the memorial service held in the auditorium on the afternoon of Saturday, May 17, 1970, for the deceased Jackson State students who were killed in the campus disturbance at Jackson, Mississippi. This service was conducted in an orderly manner with full right to do so and with the permission and cooperation of the University officials. The plaintiff, Earnest Gregory, who on cross examination admitted that he was "active with black students" had attended this service. Representative Julian Bond was to appear and speak at the auditorium later on the night of May 17 but at the last moment cancelled this speaking engagement because of his inability to attend, although he had been given permission to speak by the school authorities. A group of students, including plaintiffs Gregory and Forte, assembled outside the auditorium where Mr. Bond was to speak and then moved en masse across the campus to President McCain's home where members of the group shouted, and made demands to see the president. They were later moved back to an area on his lawn where they sat for a considerable period of time until finally convinced to disperse by university officials. It was at this gathering that one student whom Dean Moorman believes to have been one Burkett, asked if classes would be dismissed and was given a negative reply.

On the night of Saturday, May 16, plaintiff Earnest Gregory had attended a meeting at the Newman Center at which some Jackson State students were present and discussed with other students what had happened at Jackson State. Also, on the night of Sunday May 17, a group of predominantly black students estimated at between 15 and 25, attended a meeting at the Newman Club or Center, this being an unusually large crowd according to witnesses, because this is a small building. Speake, Gregory and Forte were admittedly present at this meeting. Gregory was a member of the Newman Club who frequently attended its functions; it is unknown whether Forte was a member; but, Speake had never heard of the Newman Club nor had ever been there on or prior to the night of the 17th. Speake testified that he had heard about the meeting and arrived at the Newman Club at 9:15 P.M. remaining until 10:30. He gave as his reason for attending the fact that he is a sociology major and President of the Sociology Club and was in-

50. United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed. 2d 652 (1963); Peoples Bank of Trenton v. Saxon, 373 F.2d 185 (C.A.6, 1967); Jones v. State Board of Education of and for the State of Tennessee, 279 F. Supp. 190, 200 (M.D.Tenn.1968) affd. 407 F.2d 834 (C.A.6, 1969).

51. Koblitz v. Western Reserve Univ., 21 Ohio Cir.Ct.R. 144 (1901).

terested in what people were doing and what was going on at that time. He contended that the students in attendance were just talking and that there was no discussion whatsoever concerning the closing of classes and no Jackson State students present. However, both Gregory and Forte testified that Jackson State students were present, despite Speake's denial thereof, and Forte testified that there was an extended discussion between the students concerning what demands would be made on President McCain, these demands in turn being reduced to writing. There was an extended discussion at this meeting as to whether a demand would be made that school be closed. The record is silent on the conclusion or decision reached.

Speake and Gregory left the Center at approximately 10:30 on the night of Sunday, May 17th and drove to the home of a female prospective contributor to the Newman Club, where they remained approximately four hours. They then drove directly back to the Newman Center where they met the plaintiff Forte, his brother and another student named Joe Welford. The group immediately left in Speake's Volkswagen micro-bus allegedly to drive across campus to an apartment jointly occupied by Bill Johnson and the plaintiff, Richard Peters. On the way they stopped at the Security Office on campus and Speake went into this office to check with his friend and neighbor, Robert Canavan,[52] who was on duty as desk sergeant, in order to ascertain "what was going on". He was shown a copy of the leaflet that had been brought into the Security Office almost simultaneously by another student, Maurice Neal Hazen, who found it posted at Scott Hall. The group then proceeded in the Volkswagen to Johnson and Peters' apartment where they had a cup of coffee and left in approximately 15 minutes for the alleged purpose of driving back to the Newman Center at approximately 2:30 A.M., Monday, May 18th. They testified that on the way back, they stopped and picked up the plaintiff, Richard Peters, and several other students who were walking and then proceeded to Scott Hall where some of those who were passengers were living.

At this point, Dean Grantham, Chief Oubre, Lonnie Shoultz and Patrolman King questioned Speake, who told Dean Grantham, among other things, that the group had just left Shoney's Drive Inn, which is on Highway 49 off the campus of University of Southern Mississippi. It was at this time that all of the plaintiffs denied any knowledge of the existence of the subject leaflets and later denied that they had any knowledge of the existence or presence of the approximately 200 leaflets found in the microbus.

Prior to this time, at about 1:30 A.M. on the morning of May 18th, Dean Grantham and Chief Oubre had observed several cars parked in front of the Newman Center and had seen small groups of students leaving at different intervals with leaflets or pieces of paper of similar size to the ones in question. Among this group was the plaintiff, Richard Peters, who was seen to leave with approximately 100 of the leaflets about 8½ by 11 inches in size.

In this Court's opinion, there is substantial evidence in the transcript of the hearing before the Board of Trustees to support the findings and action of the Board against each of the four plaintiffs. This is a civil proceeding and not a criminal prosecution, and therefore, it was not necessary that the evidence prove these plaintiffs guilty beyond reasonable doubt and to moral certainty. The test here is whether there is in the record substantial evidence, direct or circumstantial, to support the findings of the Board and the disciplinary action taken pursuant thereto. This Court answers this question in the affirmative in light of the foreging.

In summary, this Court finds that the Board had reasonable grounds

---

52. See Canavan's Deposition testimony and Exhibit H.

to conclude the following: that the Newman Center was the headquarters or center of all of the activities in question; that all of the plaintiffs were at the Newman Center at various times, sometimes together and sometimes not, on the night of May 16th and 17th and the early morning of May 18th; that despite the fact that final examinations would be taken by all of the plaintiffs on May 20th, 21st and 22nd, and the fact that Earnest Gregory had an important term paper to write, and that Phillip Speake had a wife and child at home, plaintiffs were engaged in the foregoing activities all night and into the early morning of the 18th of May. Furthermore, two of the plaintiffs were among the group of demonstrators at President McCain's home; the question of a demand for the suspension of classes had been discussed at the meeting at the Newman Club where at least three of the plaintiffs were present; Peters was seen leaving the Newman Club at 1:30 A.M. on the morning of May 18th with approximately 100 leaflets or pieces of paper in his possession, and other students also left at other intervals with these pamphlets; and that Speake told Dean Grantham an untruth, namely that the group had been to Shoney's Drive Inn shortly before they were questioned outside Scott Hall at approximately 2:30 A.M. on Monday morning May 18th, a day of school. It is an undisputed fact that approximately 200 of the leaflets in question were found in Speake's micro-bus which was, or had shortly before been, occupied by all of the plaintiffs, and Speake had refused to give permission to search his micro-bus on two occasions shortly before it was actually searched. The foregoing facts, when considered together, constitute sufficient direct and circumstantial evidence to substantiate the charges against all of the plaintiffs.

Certainly, the Board of Trustees was the finder of fact and had the right to determine the credibility of the witnesses particularly in view of the conflicting testimony given by them.

We wish to reiterate what we said in Brown v. Greer, *supra,* 296 F.Supp., at page 602, namely, that if actions of the type here involved are not appropriately punished and thereby discouraged, they will not only lead to anarchy but will result in the suppression of the liberty and autonomy that are the life-blood of a democracy and its educational institutions. If our institutions are not allowed to rule themselves, within reasonable bounds, as here, then others, under the banner of false liberalism, will likely rule and destroy them together with our democratic system, whose very foundation is that it is a government of laws and not of men. Real freedom does not mean unlimited permissiveness obtained through any means, including violence, but means liberty, regulated by law, and in the case of educational institutions, rules, regulations and standards of conduct.

### H. Procedural Due Process, Damages and Attorney's Fees

In their Motion for Further Relief plaintiffs contend that the defendants, for various reasons stated in Paragraph V of said motion, failed to comply with this Court's Temporary Restraining Order of June 18, 1970 pursuant to which the hearing was held before the Board of Trustees. The record fails to support each of the various contentions pleaded in support thereof, and as a matter of fact, are rebutted by the affidavits offered by the defendants at the final hearing of this cause before this Court on August 28, 1970,[53] when all parties were afforded the right to present any further evidence and to make final arguments.

In view of the fact that plaintiffs' demand for actual and punitive damages was based on their allegations of unreasonable search and seizure, which the

---

53. See Exhibits D–[1, 2, 3 and 4].

Court has found to be lawful, plaintiffs' demand for damages is without merit.

[37–39] Although the allowance of attorney's fees are normally predicated upon contract or statutory authorization, this Court, sitting as a Court of equity, does have the inherent power to award attorney's fees wherever circumstances warrant. Kemp v. Beasley, 352 F.2d 14, 23 (C.A. 8, 1965); Smoot v. Fox, 353 F.2d 830, 832 (C.A. 6, 1965). In the exercise of this equitable discretion, courts have generally denied the extraordinary relief of awarding attorney's fees absent a finding of "unreasonaɒie, obdurate obstinancy" on the part of defendants. See Bradley v. School Board of the City of Richmond, 345 F.2d 310, 321 (C.A. 4, 1965); Kemp v. Beasley, *supra;* Williams v. Kimbrough, 295 F. Supp. 578, 587, affd. 415 F.2d 874 (C.A. 5, 1969), cert. den. 396 U.S. 1061, 90 S.Ct. 753, 24 L.Ed.2d 755 [Feb. 2, 1970]. Based on the above finding of fact, this Court is of the opinion that the plaintiffs are not entitled to recover any attorney's fees from the defendants herein.

## CONCLUSION

The Court finds that the plaintiffs were not denied any of their constitutional rights by the defendants; that they were accorded a fair and reasonable hearing in compliance with all of the constitutional mandates; that there was a highly reasonable and just basis for their suspensions due to prohibitive and violative conduct on their part which was clearly established by substantial evidence; that they were not subjected to any arbitrary or capricious treatment by any of the defendants and thus are not entitled to recover damages or attorney's fees. Therefore, the Findings, Conclusions and Order of the Board of Trustees are adopted, approved and affirmed.

An Order in conformance with the above and foregoing findings of fact and conclusions of law of this Court shall be presented to the Court by the defendants within the time and in the form prescribed by the Rules.